GIFFORD-HILL & COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 13841.    Promulgated November 8, 1948.

*Robert Ash, Esq., John Y. Merrell, Esq.,* and *Carl F. Bauersfeld, Esq.,* for the petitioner.

*Frank B. Schlosser, Esq.,* for the respondent.

HARLAN, *Judge*: The respondent determined deficiencies in excess profits tax of petitioner for the calendar years 1942 and 1943 in the respective amounts of $342,538.06 and $18,568.14.

Under date of February 6, 1946, petitioner paid the collector of internal revenue the sum of $71,414.83 representing additional excess profits tax for the year 1942 in the amount of $118,738.52, less an over-payment of income tax resulting therefrom of $47,323.69. The amount of $71,414.83 has not been assessed and is carried in the suspense account of the collector.

The first question presented is whether the petitioner may include the postwar refund of excess profits tax for the year 1942, provided in section 780 of the Internal Revenue Code, in its equity invested capital as of January 1, 1943, for the purpose of determining its excess profits credit for the year 1943, and, if so, in computing equity invested capital for the purpose of determining the amount of excess profits credit for the year 1943, should petitioner include the amount of postwar refund of excess profits tax for the year 1942 in total assets in determining the ratio of inadmissible assets to total assets.

Petitioner is a corporation, organized under the laws of the State of Texas on September 3, 1926, with its principal office in Dallas, Texas. Its tax returns for the years here involved were filed with the collector of internal revenue for the second district of Texas, at Dallas, Texas. Its books of account were kept and the returns were filed on the accrual basis.

In its return for the year 1943 petitioner, in computing equity invested capital for the purpose of determining its excess profits credit, included in its accumulated earnings the sum of $30,185.79 representing the amount of its postwar refund credit claimed on its excess profits tax return for the year 1942. Respondent, in the computation of the excess profits credit based on invested capital, reduced the average invested capital shown on petitioner's return by the aforesaid sum of $30,185.79. By reason of this adjustment, respondent reduced the total of petitioner's admissible assets by the said sum of $30,185.79 in determining the ratio of inadmissible assets to total assets. The amount of the postwar refund credit, if allowable as a part of equity invested capital, will depend upon the outcome of the main issue in this proceeding.

## OPINION.

The question of whether the postwar refund credit is accruable as an asset for the year the tax which gives rise to such credit is accruable was considered by this Court in *Altschul's, Inc.*, 9 T. C. 697. In that case a taxpayer which kept its accounts and filed its returns on an accrual basis accrued as liabilities for its fiscal year ended January 31, 1943, income tax and excess profits tax for that year which were paid in the following year, and accrued as an asset in 1943, the postwar refund credit provided by section 780 of the code. These accruals were reflected in its accumulated earnings and profits as of January 31, 1943. This Court held that the postwar refund credit was properly accrued by petitioner as an asset in its fiscal year ended January 31, 1943, and should be included in its accumulated earnings and profits as of the end of that year.

The respondent concedes that the facts of the *Altschul's* case are indistinguishable from those of the instant proceeding, and that, even though the question of whether the postwar credit is an admissible or inadmissible asset was not raised, and, therefore, not decided in the cited case, the credit constitutes an admissible asset if includible in equity invested capital. Our conclusion being that the postwar refund credit is includible by petitioner in its equity invested capital as of January 1, 1943, we think our decision in *Altschul's, Inc.*, *supra*, is controlling here, and this issue is decided in favor of petitioner. Since,

however, the exact amount of the postwar refund credit depends upon our decision on the next issue to be decided in this proceeding, this amount will have to be computed under Rule 50.

The question raised by this issue is whether petitioner's excess profits net income for each of the taxable years is to be adjusted, under the provisions of section 711 (a) (2) (K) of the code, by any greater amount of nontaxable income from exempt excess output provided in section 735 than that allowed by the respondent.

### FINDINGS OF FACT.

Since its inception in 1926 petitioner has been engaged in the business of mining and selling sand and gravel. On and after the taxable years 1942 and 1943, it conducted mining operations known as the Texarkana operation, located in the vicinity of Texarkana, Texas; the Turkey Creek operation, located in Evangeline Parish, Louisiana; and the Hearne operation, located near Hearne, Robertson County, Texas. It also conducted mining operations in other fields which are not involved in this proceeding.

The lands covered by the mining operations at Texarkana, Turkey Creek, and Hearne were acquired by petitioner at various times. The parties have entered into a stipulation showing the various tracts of land comprising these three operations, the dates on which the petitioner acquired the fee or leased these tracts, the number of months of production and output from January 1, 1936, to December 31, 1939, inclusive, the estimated recoverable units as of January 1, 1942, 1943, 1944, and the output during the years 1942 and 1943 from each tract. They have also stipulated the gross income, direct expenses, depreciation, overhead, net profit, production, and net profit per ton of the three operations for the years 1936 to 1939, inclusive, and 1942 and 1943. These stipulations are incorporated herein by reference.

Petitioner is primarily a producer of sand and gravel. It does some construction work, mostly railroad and highway construction and repair, and it engages in a few other minor activities directly tying in to these two activities. It has been engaged in these activities since 1926.

In 1942 petitioner conducted 12 sand and gravel operations. It also conducted a crushed rock operation. It claimed section 735 relief for only the Texarkana, Turkey Creek, and Hearne operations.

Petitioner's main office is located at Dallas, Texas, and all of its books of account are kept there. Decisions regarding the acquisition of new tracts of land are made by its president at that office.

Each of the three mining operations here involved has its own office and a man in charge thereof. The office at Texarkana issues all direc-

tions for excavating or producing operations in that area, but directions as to shipping are issued from the Dallas office. The offices located at the Turkey Creek and Hearne operations handle their own shipping and billing and each has one sales organization.

At one time all sand and gravel were in a glacier. The rounded pebbles which constitute gravel are the result of grinding action which took place in the glacier.

Sand and gravel were not deposited in the same way in all parts of the country. In glacial regions the deposits were laid down by the glacier. In the coastal plains area, which includes Texas and Louisiana, sand and gravel are found only in the angle formed by the confluence at the intersection of a major and a minor stream. From the glacier these materials were gathered up by a stream of water and deposited in a stream bed at various places.

In Texas and Louisiana a sand and gravel deposit is always found in the angle formed by one river feeding into another. Generally, the deposit is not distributed uniformly over the land. The further away from the actual intersection of the streams, the more foreign material is found in the deposit. Nearer the intersection, where the water has had more action on the material, it has removed more of the foreign particles from the sand and gravel.

There are many different kinds of sand and gravel. All of these have different uses.

In processing sand and gravel tremendous quantities of water are needed to remove the foreign material, to clean the sand and gravel, and to help transport it. It is also necessary to carry waste material away from the plant. The accessibility of water is a most important factor in determining the location of petitioner's processing plants.

Usually it is not possible in acquiring one tract or parcel of land to procure all of a deposit of sand and gravel, as it ordinarily extends beyond the boundaries of any one tract or parcel. The land overlying the deposit has to be acquired from the owner, and in many instances he will not sell until petitioner is ready to work his land.

The geographic location of a sand and gravel deposit affects its value. The deposit must be near a railroad, near a market, and near a source of water.

Petitioner employs a staff of engineers and geologists. Tests were made in many places in each mine in an effort to locate sand and gravel. By drilling holes and bringing out the material and analyzing it, petitioner can determine how deep the gravel is. From the depth and area the content of a tract can be determined, and from experience petitioner knows how much marketable material the depth and area of sand and gravel will afford. Whenever petitioner located sand and gravel on tracts overlying the deposit, it had no difficulty acquiring the tracts as it needed them. Sometimes petitioner buys

the land outright and in other cases it buys the gravel, paying so much per cubic yard.

It would not have been possible to have operated each of the separate tracts of a deposit as a separate unit. None of them was big enough to operate separately and no tract contained material from which all of the products petitioner mined and sold could have been obtained.

During the years 1942 and 1943 all material petitioner produced went into the war effort.

### THE TEXARKANA OPERATION.

Petitioner acquired its first properties in the Texarkana sand and gravel area in July 1926, from the Texarkana Gravel Co. These properties consisted of six separate tracts and parcels of land.

Petitioner acquired the Texarkana deposit primarily to extend and further its scope of operations and, specifically, at the request of the Texas & Pacific Railway Co., which was very anxious to secure some railroad ballast from Texarkana, which it had not been able to secure prior to that time.

Borings and tests have been made in the Texarkana area continuously since 1926 in an effort to find additional sand and gravel. Other than the sand and gravel in the tracts acquired by the petitioner in the Texarkana area, practically no sand and gravel have been found in that area.

The various tracts of land acquired by petitioner in the Texarkana area are not all contiguous. On some tracts tests disclosed that the sand and gravel deposit was insufficient for profitable operation. The surface land in this area is very poor and has little value except for its content of sand and gravel. While some of the tracts overlying the deposit adjoined each other, petitioner did not operate on all adjoining tracts at the same time. It would operate on the tract that had the material that fitted the particular need of the moment and lent itself to efficient, economical operation.

Petitioner did not mine sand and gravel from all of a given tract, because in no case did sand and gravel occur throughout the entire tract. This is due to the fact that when the water put down a gravel deposit "it performed all sorts of gyrations and funny things, much as the manner in which a sandbar is formed on a river and it gets up so big and then maybe the river will cut through it and start putting another sandbar down a ways."

During the years 1942 and 1943 petitioner mined and sold 25 sand and gravel products. It was necessary for petitioner to produce all of these products in order to take care of the demand of its customers. All of these products are not obtainable from any one of the tracts that are included in the Texarkana gravel area. Five tracts produce 13 different products, 2 tracts produce 12, 1 tract produces 9, 1 tract

produces 7, 2 tracts produce 4, 1 tract produces 3, 10 tracts produce 2, and 7 tracts produce only 1 of the products sold. An efficient operation requires that these tracts be operated as a unit.

The products at Texarkana were removed by a drag line, which first removed the overburden or top material. The sand and gravel was then dug and loaded into a hauling vehicle, which transported it to the processing plant, or to the job or wherever it finally went. The drag line was moved from place to place. Processing consisted of washing, screening, separating, and grading the materials to form the different products petitioner is called upon to supply.

The main office of the Texarkana operation is located near the Holman tract, which is on the northwest edge of the deposit, approximately halfway between the northeast and southwest edges of the deposit. All of the business in this area was conducted from this office. The accounting department was located in this office and all billing was done from there. The mine's supervision was housed there and directed all operations. All communications and orders involving the Texarkana operation came in and went out from there. Shipments were made and billing was done at that point. It was the headquarters and nerve center of the Texarkana operation.

The principal processing plant at Texarkana in 1942 was on the Barry tract, which is located in the southwest section of the deposit. This plant did the bulk of the processing and is equipped with only railroad facilities for shipment.

An auxiliary processing plant is located near the main office. It served retail trade and loaded trucks only. This plant also processed special products, which were not processed at the main plant.

On the Henshaw tract, located at the extreme southwest corner of the Texarkana mine, petitioner had a small auxiliary processing plant. This plant had no trucking facilities, but had railroad facilities. At this plant special products were loaded on railroad cars, which it was physically unable to load at other points.

Due west of the Wichita tract, also at the extreme southwest corner of the mine, petitioner had another auxiliary plant which made asphalt-coated gravel, stone filter materials, engine sand, and special products for which petitioner had no other facilities.

These four plants complemented each other and made a complete operating plant and unit. In 1942 and 1943 petitioner moved its products from the various tracts of land comprising the Texarkana deposit to these central processing plants.

The Dodd and Texas & Pacific Railway Co. tracts in the Texarkana area adjoin each other, and are located in the northeasterly section of the area. Tests showing the presence of sand and gravel were made on the Dodd tract in 1927, 1931, and 1937. Negotiations to acquire the Dodd tract were begun by petitioner in 1926 or 1927. At that time

Dodd orally agreed that petitioner could have the sand and gravel on the Dodd tract whenever it wanted it. On June 6, 1941, petitioner entered into a written lease with Dodd for the operation of this tract. Petitioner leased the Texas & Pacific Ry. Co. tract in May 1932. Neither of these tracts was operated by the petitioner during the base period. On January 1, 1942, these 2 tracts had reserves of 580,990 cubic yards of sand and gravel; as of December 31, 1943, the reserves were 7,312 cubic yards. The output from these tracts was not processed at any of petitioner's plants, but was shipped directly to the nearby Red River and Lone Star Ordnance Plants as "pit-run."

There were 60 tracts in the Texarkana area which petitioner owned or leased before or during the years 1942 and 1943. Only 5 of the 28 tracts in this area from which production was had in 1942 were in operation during the base period (1936 to 1939, inclusive). Only 1 of the 19 tracts in this area from which production was had in 1943 was in operation during the base period. Six of the 12 tracts from which sand and gravel were produced during the base period were completely mined out before January 1, 1942, and 4 others were completely exhausted before January 1, 1943. In some instances several of the 60 tracts adjoined one another, and distances of approximately 3 or 4 miles separated single tracts and groups of tracts, owned or leased by petitioner, from which production was obtained. Of the 46 tracts owned by petitioner, 3 were acquired by it prior to 1934, 15 during the years 1935 to 1939, inclusive, and 28 subsequent to 1939. Of the 14 tracts leased by petitioner, 3 were acquired before 1935, 3 during the years 1937 and 1938, and 8 subsequent to 1939.

The production in cubic yards of the tracts operated by petitioner in the Texarkana sand and gravel area during the base period and the production of these tracts during the taxable years were as follows:

| Tract | Months in operation during base period | Base period production | Output 1942 | Output 1943 |
|---|---|---|---|---|
| | | Cubic yards | Cubic yards | Cubic yards |
| Houck (Briley) | 3 | 24,464.36 | 49,463.60 | 5,432.54 |
| Robinson | 12 | 152,134.62 | 10,276.09 | |
| Barry | 16 | 65,616.97 | 228,362.08 | |
| Wilson-Raffaelli | 13 | 46,117.14 | 6,756.45 | |
| Henshaw-Robertson | 23 | 308,623.33 | 6,401.35 | |
| Sewell, M. A. | 7 | 85,934.19 | | |
| Watlington | 28 | 237,881.87 | | |
| City Bldg. & Loan | 8 | 76,019.37 | | |
| Campbell, A. C. | 6 | 52,378.69 | | |
| Mansur | 23. | 181,727.73 | | |
| Runnels | 10 | 64,848.72 | | |
| Dycus | 16 | 2,028.55 | | |
| Total | | 1,297,775.54 | 301,259.57 | 5,432.54 |

The reserves of the tracts owned or leased by petitioner in the Texarkana area amounted to 3,242,598.18 cubic yards as of January 1, 1942, 1,985,135.04 cubic yards as of January 1, 1943, and 1,548,227.15

cubic yards as of January 1, 1944. In 1942, 1,639,197.51 cubic yards of sand and gravel were produced by petitioner from 28 tracts of land in the Texarkana area, and, in 1943, 437,865.82 cubic yards were produced from 19 tracts.

The respondent determined that each tract of land in the Texarkana area on which sand and gravel were produced during and subsequent to the base period years was a mineral property and that only one tract of land in this area, the Barry tract, had nontaxable income from exempt excess output under the provisions of section 735 of the code.

### TURKEY CREEK OPERATION.

About 1930 petitioner started to mine sand and gravel in the Turkey Creek area in Louisiana, and discontinued this operation in 1932. It started operating again in this area in 1936 and has operated there continuously to date.

Petitioner operated at Turkey Creek because it had many customers in Louisiana and there was a great demand for its products. Furthermore, Turkey Creek provided a very fine and strategic deposit of sand and gravel.

The Turkey Creek operation covers 6 tracts of land, all of which are contiguous. The Hirsch tract consists of 2 parcels separated by the B. C. L. & D. tract. However, both parcels were conveyed to petitioner by one instrument. The 10-acre King tract is actually a part of the Hirsch tract which was acquired by Mrs. King by adverse possession.

As in the case of the Texarkana operation, the sand and gravel in the Turkey Creek area were found in the confluence of streams, and are located on the shore of Turkey Creek, very close to Bayou and Lake Cocodrie.

Turkey Creek sells about 15 products. All of these products are not available on any 1 tract.

Turkey Creek is a dredging operation. The mining is done by means of a suction dredge mounted on a boat or pontoons. It has a prime mover consisting of a big centrifugal pump pulled by electric motors. It has a pipe line running from it which pumps the sand and water through it. On the front it has a cutter that goes down under water and tears loose the sand and gravel and picks it up in the pipe leading to the centrifugal pump, which puts it through the pipe line back across the surface of the water to the shore, where it goes into a vehicle to be transported to the processing plant. The dredge is not movable except as it digs itself from place to place.

It was practically impossible to operate each tract of land in Turkey Creek separately. It would have required a dredge on each tract. Such an operation would not have been economically feasible.

The office of the Turkey Creek sand and gravel area was located near the northeast corner of the area. The processing plant was located a little bit west of the main office. All material that was processed went through this plant.

The production of the tracts in the Turkey Creek area in cubic yards during the base period (1936 to 1939, inclusive) and during the taxable years was as follows:

| Tract | Months in operation during base period | Base period production | Output 1942 | Output 1943 |
|-------|----------------|----------------|------------|------------|
|       |                | Cubic yards | Cubic yards | Cubic yards |
| B. O. L. & D. | 41 | 155, 067. 99 | 4, 120. 99 | 110, 627. 11 |
| Hirsch | 28 | 127, 625. 64 | 129, 212. 57 | 209, 185. 15 |
| McCormack |  |  |  |  |
| King |  |  | 188, 793. 80 |  |
| Crowell-Spencer | 18 | 53, 910. 10 |  |  |
| Kenyon | 16 | 7, 028. 15 |  |  |
| Total |  | 343, 631. 88 | 322, 127. 36 | 319, 812. 26 |

All the tracts in the Turkey Creek area were acquired by petitioner during or prior to the base period, with the exception of the King tract, which petitioner acquired in November 1941.

The Crowell-Spencer and Kenyon tracts had no reserves as of January 1, 1942. The reserves of the other four tracts aggregated 1,898,-834.37 cubic yards as of January 1, 1942, 1,576,710.01 cubic yards as of January 1, 1943, and 1,256,897.75 cubic yards as of January 1, 1944.

The respondent treated each tract of land in the Turkey Creek area on which sand and gravel was produced during and subsequent to the base period as a mineral property and determined that only one tract of land in this area, the Hirsch tract, had nontaxable income from exempt excess output under the provisions of section 735 of the code.

### HEARNE OPERATION.

The Hearne, Texas, area, in which petitioner conducted sand and gravel operations, lies in the angle formed by the Brazos and the Little Brazos Rivers and is on the bank of the Little Brazos River. Hearne was a dredge operation similar to that at Turkey Creek and, because of the dredge feature, it was not feasible for the petitioner to conduct more than one operation of this kind in the Hearne area. The office for this area is located near the center of the deposit and in the northwest corner of the tract petitioner acquired in 1935 from the National Life Insurance Co. and the processing plant was also located on that tract. The Hearne area produced about 15 sand and gravel products. It was practically the sole production point for the huge airfield at Bryan, Texas, which was constructed during

1942 and 1943. To supply this airfield, petitioner took out its best materials.

The production in cubic yards of the tracts in the Hearne area during the base period (1936 to 1939, inclusive) and during the taxable years was as follows:

| Tract | Months in operation during base period | Base period production | Output 1942 | Output 1943 |
|---|---|---|---|---|
| | | Cubic yards | Cubic yards | Cubic yards |
| S. & G. Co. | | | | |
| Nat'l Life Ins. Co. | | | 161, 274. 96 | 162, 857. 51 |
| Ely | 48 | 332, 450. 29 | 13, 782. 76 | 17, 058. 27 |
| Black Bridge | 26 | 130, 313. 00 | | |
| Baker-Smith | 2 | 261. 00 | | |
| Beckworth | 7 | 777. 20 | | |
| Total | | 463, 801. 49 | 175, 057. 72 | 179, 915. 78 |

The reserves of the first 3 tracts were 957,278 cubic yards as of January 1, 1942, 782,220.28 cubic yards as of January 1, 1943, and 602,304.50 cubic yards as of January 1, 1944. The reserves of the last 3 tracts were exhausted prior to January 1, 1942.

The respondent treated each separate tract or parcel of land in the Hearne area on which sand and gravel were produced during and subsequent to the base period as a mineral property and determined that none of these tracts or parcels qualified for relief under section 735.

## OPINION.

Section 711 (a) (2) (K) of the code provides that where a corporation, a producer of minerals, computes its excess profits credit under the invested capital method, there shall be excluded, in computing excess profits net income, nontaxable income from exempt excess output of mines provided in section 735.

Section 735 provides that the term "excess output" means the excess of the mineral units for the taxable year over the normal output (subsection (a) (3) ); that the term "normal output" means the average annual mineral units recovered in the taxable years beginning after December 31, 1935, and not beginning after December 31, 1939 (called the "base period"), of the person owning the mineral property, whether or not the taxpayer, and that any mineral property which was in operation for less than six months during the base period shall be deemed not to have been in operation during the base period (subsection (a) (4) ); that the average annual mineral units shall be computed by dividing the aggregate of such mineral units for the base period by the number of months for which the mineral property was in operation during the base period and by multiplying the amount so ascertained by twelve (subsection (a) (4) ) ; that the term "mineral property" means a mineral deposit, the development and plant neces-

sary for the extraction of the deposit, and so much of the surface of the land as is necessary for purposes of such extraction (subsection (a) (6)); that the term "minerals" means "ores of the metals, coal, and such nonmetallic substances as * * * gravel, * * * sand, silica * * * and talc" (subsection (a) (7)); that the term "normal unit profit" means the average profit for the base period per mineral unit for such period, determined by dividing the net income with respect to minerals recovered from the mineral property during the base period by the number of mineral units recovered from the mineral property during the base period (subsection (a) (9) ); and that the term "estimated recoverable units" means the estimated number of units of metal, coal, or nonmetallic substances in the estimated recoverable minerals from the mineral property at the end of the taxable year plus the excess output for such year (subsection (a) (10)). The term "exempt excess output" is defined in subsection (a) (11) to mean a number of units equal to certain percentages of the excess output for such year listed therein.

Section 735 (b) defines nontaxable income from exempt excess output as follows:

For any taxable year for which the excess output of *mineral property which was in operation during the base period* exceeds 5 per centum of the estimated recoverable units from such property, the nontaxable income from exempt excess output for such year shall be an amount equal to the exempt excess output for such year multiplied by the normal unit profit * * *. [Italics supplied.]

Section 35.735–2 of Treasury Regulations 112, in so far as here pertinent, provides:

(f) Mineral Property.—The term "mineral property" means a mineral deposit, the development and plant necessary for the extraction of the deposit, and so much of the surface of the land as is necessary for the purposes of such extraction. The term "mineral deposit" refers to the minerals in place. The taxpayer's interest in each separate mineral property is a separate "property." If the mineral deposit in which a taxpayer owns an economic interest extends beyond the boundaries of a single tract or parcel of land a separate mineral property exists with respect to each tract or parcel of land into which the mineral deposit extends. * * *

The respondent's main contention is that each tract of land, or lease, constitutes a "mineral property" within the meaning of the statute and the regulations promulgated thereunder. If we should hold to the contrary, he contends, in the alternative, that the statute has no application to the tracts of land or leases acquired by petitioner after December 31, 1939, the end of the base period, or to those properties from which there was production during the taxable years but none during the base period. As a second alternative, he contends that the evidence clearly shows that, at least, the Dodd and Texas & Pacific tracts in the Texarkana area were separate mineral properties.

The petitioner contends that the respondent's regulations are con-

trary to the plain words and meaning of the statute; that Congress has defined "mineral property" to include a mineral deposit, the development and plant and the surface of the land necessary for its extraction; that those three criteria are disregarded by the regulations in any case where the mineral deposit extends beyond the boundaries of a single tract or parcel of land; that each of the three areas here involved, Texarkana, Turkey Creek, and Hearne, constitutes one mineral property or mineral deposit; that in determining "normal output" it is immaterial by whom the production was carried on during the base period or by whom the surface of the land was owned; that during the base period each of the three mineral properties was in active operation; that in 1942 and 1943 the mineral units recovered from each of these three mineral deposits exceeded the average annual mineral units recovered during the base period; that its output from each of these three mineral properties in 1942 and 1943, to the extent such output exceeded the average annual mineral units recovered from these deposits during the base period, is "excess output" as defined in section 735 (a) (3); and that it is entitled to exclude net income realized from exempt excess output in determining excess profits net income for the years 1942 and 1943.

An examination of section 735 and its legislative history convinces us that its purpose was to stimulate the production of natural resources required for the manufacture of war materials and the construction of training camps, airfields, ordnance plants, etc., necessary for the conduct of the war. It gives producers of minerals an incentive to produce an amount in excess of normal output of a mineral property by providing that a substantial portion of the income realized as a result of any excess output may be excluded from excess profits net income. To assist in the determination of the portion of the amount produced in a war year which constituted "excess output," this term is defined in subsection (a) (3) to mean the excess of the mineral units for the taxable year over the normal output. Subsection (a) (4) defines "normal output" to include the average annual mineral units recovered from the mineral property in the base period years of the person owning the property (whether or not the taxpayer).

Following his regulations, the respondent determined that each single tract or parcel of land into which the mineral deposit extends is a separate mineral property, and that petitioner is not entitled to any benefit under section 735 from any tract or parcel which it acquired prior to or during the base period and did not work until subsequent to December 31, 1939, from any tract or parcel which was in operation for less than six months during the base period, and from any tract or parcel which was in operation during the base period but either did not have any production during the taxable years or did not have an output showing an excess of mineral units for the taxable

year over the normal output of the tract or parcel for the base period. In other words, he restricted the benefits of section 735 to the excess output of petitioner from those parcels of land in each area in which it had an economic interest and from which it actually extracted minerals during the base period years and subsequent thereto.

That part of the respondent's regulations which provides that "If the mineral deposit in which a taxpayer owns an economic interest extends beyond the boundaries of a single tract or parcel of land a separate mineral property exists with respect to each tract or parcel of land into which the mineral deposit extends" does not correctly interpret the language of the statute as expressed in subsection (a) (6) of section 735, and is invalid. That subsection defines "mineral property" to mean a mineral deposit, the development and plant necessary for the extraction of the deposit, and so much of the surface of the land as is necessary for the purposes of such extraction. There is nothing in this statutory provision which confines a mineral property or deposit to the boundaries of any single tract or parcel of land, and there is nothing therein requiring a comparison of the output of any particular tract or parcel during the base period with its output during the taxable years in qualifying for the benefits of section 735. The comparison required for the purpose of determining excess output is between the output of the mineral property or mineral deposit in the taxable year or years and its output during the base period years.

The evidence discloses that in the coastal plains area, which includes Texas and Louisiana, a sand and gravel deposit is always found in the angle formed by the confluence of two ancient rivers; that in some places the deposit is concentrated in sufficient quantities for profitable production, and in others it is so thin or the overburden is so great that commercial production is economically impossible; and that this sand and gravel deposit was placed in the angle formed by two ancient rivers by Mother Nature, without regard to tracts, leases, or future ownership of the land. The Texarkana, Turkey Creek, and Hearne areas were each located in the angle formed by two such rivers and each area contained a sand and gravel deposit which extended beyond the boundaries of any one tract or parcel of land.

Petitioner began the extraction of sand and gravel in the Texarkana area in 1926, in the Turkey Creek area in 1930, and in the Hearne area in 1934. It installed in each of these areas the plant and equipment required for each operation, and acquired so much of the surface of the land as was necessary for purposes of extraction. It was impractical and unnecessary for it to acquire all of the land into which each deposit extended at one time, as it had a virtual monopoly because of its installation of the necessary excavating and processing equipment and it knew that it could acquire all of the land into which

the mineral deposit extended when it needed such land, and in some instances it had oral agreements or understandings to that effect. Because the Turkey Creek and Hearne operations were dredging operations, the parcels acquired from time to time in those areas were contiguous, whereas in the Texarkana area, where the sand and gravel were removed by a drag line, the parcels were not always contiguous, the acquisition of any particular parcel being controlled by the nature of the sand and gravel underlying it. In this area petitioner would operate on the tract that had the material that fitted the particular need of the moment and lent itself to efficient, economical operation. No single tract had the variety of sand and gravel products sold by petitioner.

From the foregoing it is apparent that petitioner had in each of the three areas during the taxable years an economic interest in a deposit of sand and gravel, the plant and equipment necessary to excavate and process these minerals, and so much of the surface of the land as was necessary for the purposes of extraction. In each of these areas, therefore, it had a "mineral property" as defined in subsection (a) (6) and each mineral property was in operation for a period in excess of six months during the base period years.[1] Under the provisions of section 711 (a) (2) (K), petitioner is entitled to an exclusion in computing excess profits net income if pursuant to the provisions of section 735 it appears that the mineral units it recovered during the years 1942 and 1943 from each of its three mineral properties exceeded the average annual mineral units recovered from each of these properties during the base period years. Petitioner has proved that it had such an excess output from each mineral property in each of the taxable years. Under the provisions of section 711 (a) (2) (K), it is therefore entitled to exclude, in computing excess profits net income, nontaxable income from exempt excess output for each of the taxable years, which, under the provisions of section 735 (b), is an amount equal to the exempt excess output for each year (computed in accordance with subsection (a) (11) of section 735) multiplied by the normal unit profit.

The respondent's alternative contention that the Dodd and Texas & Pacific tracts in the Texarkana area were separate mineral properties has not been overlooked. It is based largely on evidence that these tracts, which were contiguous, were approximately three miles from the nearest other tract in the area and that all sand and gravel mined therefrom during 1942 and 1943 were shipped to the nearby Red River and Lone Star Ordnance Plants as "pit-run." These two tracts were not the only tracts in the northeast section of the Texarkana area, and six tracts were three or four miles farther away from petitioner's

---

[1] In *Black Mountain Corporation*, 5 T. C. 1117, it was held that separate acquisitions of coal land need not be treated as separate properties for the purpose of computing percentage depletion.

processing plant than the Dodd and Texas & Pacific tracts. We are satisfied from the evidence, however, that all of these tracts were a part of the Texarkana mine or mineral deposit, and that they should be so treated rather than as separate mineral properties. Because the output of the Dodd and Texas & Pacific tracts was shipped directly to nearby ordnance plants as "pit-run" without processing is no sound reason for treating each tract as a separate mineral property.

Reviewed by the Court.

*Decision will be entered under Rule 50.*