GRAVES BROTHERS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 28809, 29446.   Promulgated March 18, 1952.

*Marshall O. Mitchell, Esq., James P. Hill, Esq., F. B. Colley, Esq.,* and *William R. Frazier, Esq.,* for the petitioner.

*Newman A. Townsend, Jr., Esq.,* for the respondent.

ARUNDELL, *Judge:* The respondent determined deficiencies in taxes for fiscal years ended June 30, 1943, 1944, and 1945, as follows:

|  | Year | Deficiency |
|---|---|---|
| Income tax | 6/30/43 | $36, 501. 90 |
|  | 6/30/44 | 21, 205. 90 |
| Declared value excess-profits tax | 6/30/43 | 9, 197. 56 |
|  | 6/30/44 | 6, 396. 82 |
|  | 6/30/45 | 2, 929. 15 |
| Excess profits tax | 6/30/44 | 6, 101. 35 |
|  | 6/30/45 | [1] 75, 232. 85 |

[1] Amount as stipulated.   The notice of deficiency shows this amount to be $73,232.85.

At the hearing, counsel for the parties announced agreement as to issues concerning the rate of depreciation applicable to citrus groves,

the loss sustained by the petitioner in the fiscal year 1943, and the gain realized in the fiscal year 1945 on the sale of property used in trade or business, and the income from advance oil royalties for the fiscal year 1945.

The issues presented for decision are: (1) Whether deductions are allowable for the fiscal years 1941 to 1945, inclusive, for interest paid on debenture notes; (2) whether losses sustained on sales in the fiscal year 1944 are deductible because of the stock ownership by the vendees in the petitioner and also whether the losses, if allowable, are allowable in full or subject to capital loss treatment; (3) whether a dividend paid in 1925 impaired capital so as to reduce the petitioner's equity invested capital for the fiscal years 1944 and 1945; and (4) whether the petitioner had net abnormal income which entitled it to relief under Code section 721 for the fiscal years 1944 and 1945. The basis for excess profits tax relief is the petitioner's claim that it had abnormal income resulting from the development of tangible property within the meaning of section 721 (a) (2) (C).

Issues as to the net operating carry-overs and unused excess profits credit adjustment will be determined automatically as the result of decisions on the issues above stated.

## General Facts.

### FINDINGS OF FACT.

The petitioner is a corporation organized under the laws of the State of Florida, on February 2, 1915, and has its principal office at Wabasso, Florida. Its returns for the taxable years were filed with the collector for the district of Florida, at Jacksonville.

The petitioner's books of account during the taxable years were kept on the accrual basis, with a fiscal year ending June 30.

The petitioner was originally organized by W. F. Graves and his brother, J. E. Graves. W. F. Graves died in June 1937, and J. E. Graves died in January 1949.

Under date of February 4, 1915, the petitioner issued, as fully paid and nonassessable, common stock in the amount of $350,000, represented by 3,500 shares of a par value of $100 each. There has been no change in the number of outstanding shares, nor the par value thereof, of the common stock of the petitioner since its original issue.

In the early days of its existence, the petitioner carried on an extensive saw mill and planing mill operation near Hosford, Florida. About the year 1919, timber tracts became scarce and difficult to obtain, and the petitioner sought other activities in which to engage. Shortly thereafter petitioner acquired a 32,225 acre tract in Indian River County, a short distance from Vero Beach, Florida. This land was

purchased for the principal purpose of raising farm crops for market, and in addition, to engage in citrus horticulture, cattle raising and cutting of timber on said land, and the manufacture of same into lumber.

The petitioner ceased its timber operations about 1937 or 1938. It pastured cattle on its cut-over timber lands, but ceased all cattle operations prior to the fiscal year 1944.

In recent years the petitioner has been engaged primarily in the business of growing, harvesting, processing, and marketing of citrus fruits. In the taxable years the petitioner had approximately 500 acres of producing citrus groves.

## *Issue 1. Interest Deductions.*

### FINDINGS OF FACT.

Prior to October 1, 1936, the petitioner credited to open accounts of its stockholders substantial amounts representing dividends on their stock. Some of those accounts were also credited with unpaid salaries and interest on the unpaid balances. From time to time, loans and advances were made to the petitioner which were reflected in the open accounts, and various withdrawals were made by the stockholders which were charged to those accounts.

When the audit of the petitioner's accounts was being made for the fiscal year ended June 30, 1935, the petitioner's president, W. F. Graves, instructed the accountants making the audit to cancel the credit accounts of certain of the stockholders. This was accomplished on the petitioner's journal by debits to the several stockholders and a credit to surplus in the amount of $738,304.88 which was the aggregate of the several accounts that were debited. The instructions so given by W. F. Graves had not been authorized by the stockholders and there was no record in the petitioner's minutes concerning any release of indebtedness. Two of the stockholders were minors in 1935.

On September 25, 1936, a meeting of the petitioner's stockholders was held at which all stockholders were represented either in person or by proxy. At that meeting, the June 30, 1935, cancelation of accounts was discussed and a resolution was adopted wherein the action of the president, in giving instructions for the cancelation and the action of the accountants in making the entries of that date, were "repudiated, rescinded and annulled" and the books of the company were "ordered to be corrected accordingly." Journal entries were thereupon made, dated June 30, 1936, reversing those of June 30, 1935, by charging $738,304.88 to surplus and crediting to the various stockholders the several sums that had been charged to their accounts by the 1935 entry.

At the time of the stockholders' meeting of September 25, 1936, the balance that the petitioner owed to its stockholders on open account amounted to $706,260.71 which consisted of the following, in totals:

| | | |
|---|---:|---:|
| Credits | | $2,774,257.62 |
| Debits: | | |
| Withdrawals | $1,874,134.32 | |
| Inter-account transfers and adjustments | 193,862.59 | 2,067,996.91 |
| Balance | | $706,260.71 |

The indebtedness of the petitioner was referred to in a resolution by the stockholders, which recited that it was the desire of the stockholders to preserve the credit of the petitioner; that it was to the advantage of the stockholders that the credit of the petitioner be preserved even at the expense of deferring the demand date in respect of the sums owing and of granting to the petitioner an extension of the date of payment and a lower interest rate than the maximum legal rate in Florida. Following such recital, it was formally resolved that the petitioner:

\* \* \* do issue its debenture notes in the amount of $706,260.71, being the aggregate amount of the items owing to its stockholders; that such debenture notes be issued in the denominations requested by the several stockholders, with the aggregate amount to be issued to each stockholder being determined by the amount shown by the books of the company to be owing to such stockholder.

The resolution further set forth in detail the form of the debenture notes, including the specific provisions to be incorporated therein. In accordance with the provisions of the resolution, debenture notes in the aggregate face amount of $706,260.71 were issued to the creditor-stockholders as follows:

| Stockholder | Debenture |
|---|---:|
| J. E. Graves | $97,229.74 |
| Mamie C. Graves | 101,659.93 |
| J. R. Graves | 17,182.99 |
| Mary G. Robertson | 30,842.18 |
| Kathryn G. Murphee | 29,697.90 |
| Annabelle G. Bell | 33,861.80 |
| Betty G. Shelfer | 35,262.55 |
| W. F. Graves | 100,133.37 |
| Eleanor T. Graves | 100,439.24 |
| W. F. Graves, Jr | 40,335.11 |
| J. Hubert Graves | 23,969.81 |
| Robt. W. Graves | 40,757.30 |
| Florrie G. Allen | 40,101.63 |
| C. G. Wilhoit | 14,786.53 |

Under the terms of the debenture notes, the face amounts were payable on October 1, 1956, with interest in the meantime payable annually at the rate of 6 per cent. They were subordinate and inferior to all legal obligations of the petitioner (excepting obligations based

on common or preferred stock) whether arising from contract or tort liability and whether existing before or incurred after the issuance of the debentures. No dividends were to be paid on stock until payment had been made, or provided for, of earned interest on the debentures or their principal if they had matured. No payment of interest on, or principal of, the debentures was to be made except out of assets in excess of the petitioner's liabilities, but inability of the petitioner to pay interest in any year would not avoid its obligation to pay such interest. The petitioner had the right to call any of the debentures on 10 days' notice. In the event of default for three years in payment of interest, or principal after maturity, the debenture holder could sue and obtain judgment, but any such judgment was inferior to the rights of common or secured creditors to be paid first out of the assets of the petitioner. Upon any dissolution or liquidation, debentures were to be paid, as to matured interest and principal, out of assets after payment of general creditors but before distributions to stockholders as such. Subject to the limitations in the debentures themselves, the debentures were negotiable instruments transferable by endorsement.

The amount of interest paid by the petitioner on its debenture notes, since the date of issue through the fiscal year 1945, and the rate of interest, have been as follows:

| Year ended June 30 | Amount | Rate (per cent) |
|---|---|---|
| 6–30–37 (9 months) | $31, 781. 73 | 6 |
| 6–30–38 | 42, 375. 64 | 6 |
| 6–30–39 | 42, 375. 64 | 6 |
| 6–30–40 | 42, 375. 64 | 6 |
| 6–30–41 | 28, 250. 43 | 4 |
| 6–30–42 | 35, 313. 03 | 5 |
| 6–30–43 | 49, 438. 24 | 7 |
| 6–30–44 | 56, 500. 85 | 8 |
| 6–30–45 | 42, 375. 64 | 6 |

The reductions in interest rates and amounts for the fiscal years 1941 and 1942 were assented to by the debenture holders. The increases in rates and amounts for the fiscal years 1943 and 1944 were for the purpose of making up the interest deficiencies in the two preceding years.

Deductions have been claimed by the petitioner in its income and excess profits tax returns for interest payments on the debentures in the amounts above set forth. None of the deductions claimed for the fiscal years 1937 through 1940 have been disallowed by the respondent. The interest deductions claimed for the fiscal years 1941 through 1945 have been disallowed by the respondent in the full amounts thereof.

The only retirement of debentures was made as of August 1, 1946, when debentures in the face amount of $392,397.02 were retired.

The debenture notes issued by the petitioner dated October 1, 1936, were evidences of indebtedness of the petitioner.

Section 23 (b) of the Internal Revenue Code allows a deduction for "All interest paid or accrued * * * on indebtedness * * *." The respondent has disallowed deductions for interest paid on debenture notes issued by the petitioner on the ground that the notes had the characteristics of and were essentially equivalent to preferred stock.

The factors customarily applied to such instruments were considered in the cases of *John Kelley Co.*, 1 T. C. 457, and *Talbot Mills*, 3 T. C. 95, both affirmed at 326 U. S. 521. We have examined the facts in this case in the light of the decisions in those cases and we conclude that the debentures involved herein had the characteristics of evidences of indebtedness rather than those of stock.

Our findings contained the essential characteristics of the debentures and they need not be repeated in detail here. Among them are the name "debenture note," the presence of a maturity date, the absence of restriction as to the source of payment, and the right to enforce payment. Another factor worthy of note is that the debentures in these proceedings were neither issued in exchange for stock nor in proportion to stockholdings.

Beyond the matter of the formal provisions of the instruments, there is the basic question of whether there was a bona fide indebtedness which is evidenced by such instruments. The evidence in these proceedings is that at the time of the issuance of the debentures the petitioner had on its books accounts payable to the several individuals who received debentures. The amounts in such accounts represented unpaid salaries, dividends, loans and advances, and interest on the credit balances. Some of the accounts were of long standing, running back as far as 1918. There is nothing in the evidence to indicate any lack of genuineness of the indebtedness or of the accuracy of the amounts.

The respondent points out that over the years there had been withdrawals by some of the debtors and inter-account adjustments, which if applied to loans and advances would leave the balance in the accounts substantially equivalent to the amounts of unpaid dividends. No reason is apparent as to why any credits should have been applied to any item in the accounts in preference to any others. Moreover, the declaration of a dividend by a corporation creates the relation of debtor and creditor between it and its stockholders. *T. R. Miller Mill Co.*, 37 B. T. A. 43, affd. 102 F. 2d 599.

It is our conclusion that the petitioner is entitled to deductions for interest on its debentures in the taxable years.

The pleadings raise no issue as to the treatment of the face amount of the debentures as borrowed capital, nor as to the amount deductible in any year as interest. However, on brief the parties are agreed that if the interest issue is decided in favor of the petitioner, the debentures

are to be treated as representing borrowed capital for excess profits tax purposes, and that the interest should be accrued and deducted at the rate of 6 per cent per year rather than at the variable rates used in the years 1941 through 1944. This agreement will be given effect in the recomputation under Rule 50 .

## Issue 2. Losses on Sales.

### FINDINGS OF FACT.

In the fiscal year ended June 30, 1944, the petitioner made several sales of real estate, among which were the following:

| Property | Purchaser | Loss sustained |
|---|---|---|
| 12 lots in Jacksonville, Fla | Richards | $2, 738. 09 |
| 110 acres of land | R. W. Graves | 4, 724. 40 |
| 120 acres of land | J. R. Graves | 4, 330. 70 |
| 20 acres of land | J. Hubert Graves | 187. 46 |

The petitioner's stockholders and the number of shares held by each from June 30, 1941 to June 30, 1943, were as follows:

| Name of stockholder | 6-30-41 to 6-30-43 | 6-30-44 to 6-30-45 |
|---|---|---|
| Family of J. E. Graves: | | |
| J. E. Graves | 390. 872 | 390. 872 |
| Mamie C Graves | 300 | 300 |
| J. E. Graves, Jr | 150 | 150 |
| J. R. Graves | 150 | 150 |
| Mary G. Robertson | 150 | 150 |
| Kathryn G. Murphee | 150 | 150 |
| Annabelle G. Bell | 150 | 150 |
| Betty G. Shelfer | 150 | 150 |
| Family of W. F. Graves: | | |
| W. F. Graves | 590. 873 | -------- |
| Eleanor T. Graves | 200 | 200 |
| W. F. Graves, Jr | 200 | 347. 718 |
| J. Hubert Graves | 200 | 347. 718 |
| Robt. W. Graves | 200 | 347. 718 |
| Florrie G. Allen | 100 | 247. 718 |
| W. W. Allen | 100 | 100 |
| J. M. Barnes | 212. 170 | 212. 170 |
| C. G. Wilhoit | 106. 085 | 106. 085 |
| Total shares outstanding | 3, 500 | 3, 500 |

The relationship of the petitioner's stockholders in the above years was as follows:

J. E. Graves..................Brother..................W. F. Graves

| | | | | |
|---|---|---|---|---|
| Mamie C. Graves | Wife | | Eleanor T. Graves | Wife |
| J. E. Graves, Jr | Son | | W. F. Graves, Jr | Son |
| J. R. Graves | Son | | J. Hubert Graves | Son |
| Mary G. Robertson | Daughter | | Robert W. Graves | Son |
| Kathryn G. Murphee | Daughter | | Florrie G. Allen | Daughter |
| Annabelle G. Bell | Daughter | | | |
| Betty G. Shelfer | Daughter | | | |

W. W. Allen, husband of Florrie G. Allen
J. M. Barnes, no relation
C. G. Wilhoit, nephew of J. E. and W. F. Graves

The 12 lots sold to one Richards had been acquired by the petitioner in exchange for an equity in a house that it had previously acquired on a debt arising out of one of its lumbering operations. The lots were not used in the petitioner's trade or business. They were capital assets in the hands of the petitioner.

The acreage sold to R. W. Graves, J. R. Graves and J. Hubert Graves was cut-over timber land, and was part of the 32,225-acre tract acquired by the petitioner for use in its lumber business. After lumber operations ceased in about 1937, the land was used by the petitioner to graze cattle, but such use ceased prior to the fiscal year 1944.

OPINION.

The petitioner sold a number of properties in its 1944 fiscal year, some at a gain and some at a loss. The net result of the several sales was a loss in the amount of $7,449.65 for which an ordinary loss deduction was claimed in the return for that year. The respondent took into consideration gains and losses on other transactions and restored the amount of $7,895.94 to income.

The respondent's disallowance is based on the theory that the properties sold were capital assets, and losses on the sale thereof are deductible only to the extent of gains from the sale or exchange of like assets under Code section 117 (d) (1). The respondent further contends that the losses sustained on the sales to R. W. and J. R. Graves are not allowable deductions because of the stock ownership of members of the Graves families in the petitioner.

At the trial, counsel for the petitioner conceded that the 12 lots in Jacksonville were capital assets. On brief, his position is that Code section 117 (j) so far modifies section 117 (a) that all real estate owned by a corportaion is to be considered to be property used in its trade or business so that a sustained loss is to be treated as provided in section 117 (j), that is, as deductible in full. We know of no authority for this position. It is easily conceivable that a corporation might acquire real property for uses other than in its trade or business. The petitioner has not established that the 12 lots were either acquired for use in its business or used in its business. On this failure of evidence, it must be held that the deduction allowable for the loss sustained on the 12 lots is limited by section 117 (d) (1).

The sales of acreage come within the provisions of section 117 (j). The respondent asks for a finding that at the time of sale such acreage was not being used in the petitioner's trade or business. We have not made the requested finding because of the evidence that the land sold was part of the larger tract that was originally acquired by the petitioner for use in its business. Property acquired for use in a trade or business does not lose its character as such property merely because it ceases to be actively used in the business. *Solomon Wright, Jr.,*

9 T. C. 173, *Carter-Colton Cigar Co.*, 9 T. C. 219. Consequently, the losses sustained on sales of acreage are deductible in full under the provisions of section 117 (j).

The respondent's contention that the losses on acreage sales are not deductible because of the provisions of Code section 24 (b) cannot be sustained. Section 24 (b) (1) (B) provides for the disallowance of losses on sales between an individual and a corporation where the individual owns more than 50 per cent of the stock of the corporation. Under the provisions of paragraph (2) of that section, an individual is regarded as owning the stock that is owned by his brothers, sisters, spouse, ancestors, and lineal descendants. R. W. Graves and J. Hubert Graves were members of the family of W. F. Graves; J. R. Graves was a member of the family of J. E. Graves. Neither of these families, including in each family the persons bearing the relationships set out above, owned as much as 50 per cent of the stock of the petitioner. Each of the families, as defined by section 24 (b) (2) (D), owned approximately 1,590 shares of stock, which is less than 50 per cent of the outstanding 3,500 shares. This the respondent recognizes, but he urges that because of the close blood and personal relationship between the two families, the stock interests of the families should be combined for the purpose of deciding this issue. This is not permissible under the statute. Under subparagraphs (B) and (D) of section 24 (b) (2), the family of a shareholder includes "only" the persons related as above described. We are not at liberty to bring in collateral relatives in determining the matter of stock ownership. *Hosch Brothers Co.*, 3 T. C. 279.

## Issue 3.  Impairment of Capital.

### FINDINGS OF FACT.

On April 1, 1924, the petitioner sold its plant and timber lands located at Carrebelle, Florida, for $1,600,000, realizing thereon a profit of $333,483.58. The terms of the sale included a down payment of $50,000, another payment of $50,000 during 1924, the assumption by the purchaser of an outstanding mortgage in the amount of $418,380, with the balance payable in semiannual installments of $100,000 through October 1, 1929, the final installment of $81,620 due on April 1, 1930.

In the calendar year 1927, after the Congress had enacted section 212 (d) of the Revenue Act of 1926, relating to the reporting of sales of realty and personalty on the installment basis, the petitioner filed amended consolidated income tax returns for the taxable years 1924, 1925, and 1926. In so doing, petitioner's sale of plant and timber in the taxable year 1924 was retroactively placed on the installment basis. The petitioner's adjusted surplus (credit balance) as of December 31,

1924, after filing an amended consolidated return for said year, amounted to $156,986.02. The petitioner's surplus and undivided profits at December 31, 1925, before the filing of its amended consolidated returns, amounted to $204,380.17. After the filing of amended returns, and the receipt of a partial refund of 1924 income tax, there was a deficit in the petitioner's earned surplus at December 31, 1925, in the amount of $56,347.56.

During the year 1925, the petitioner declared and paid a dividend in the amount of $350,000. The petitioner's minute book fails to disclose any minutes relative to the declaration of any dividend during the year 1925.

OPINION.

The respondent reduced the amount of the petitioner's equity invested capital for the years 1941 to 1945, inclusive, and thereby effected a reduction of the excess profits credit. The reduction in invested capital is based on the respondent's determination that the $350,000 dividend paid in 1925 was in excess of the petitioner's accumulated earnings and profits and to the extent of the excess the payment resulted in an impairment of invested capital.

The transaction that lies back of this issue is the sale by the petitioner in 1924 of a plant and timber lands at a profit of $333,483.58. By treating that sale as a closed transaction and the profit as having been realized, the amount of accumulated earnings and profits in the year 1925 was more than sufficient to cover the 1925 dividend of $350,000. In amended returns, filed after enactment of the Revenue Act of 1926, the sale was treated as a sale made on the installment plan and the amount of income realized was computed and reported on the installment basis. The effect of this was to reduce the amount of accumulated earnings and profits so that the payment of the 1925 dividend created a deficit of $56,347.56 in the surplus account.

Internal Revenue Code section 718 defines equity invested capital for purposes of the excess profits tax that was in effect in the years here involved. Subsection (b) of section 718 provides for reductions in equity invested capital, one of which is:

(1) DISTRIBUTIONS IN PREVIOUS YEARS.—Distributions made prior to such taxable year which were not out of accumulated earnings and profits;

Treasury Department Regulations 112 provided that for excess profits tax purposes, in general, accumulated earnings and profits are the same as for income tax purposes. Section 35.718–2. Section 29.115–3 of Regulations 111, which defined earnings and profits for income tax purposes provided then, as now, in part:

* * * a corporation computing income on the installment basis as provided in section 44 shall, with respect to the installment transactions, compute earnings and profits on such basis; * * *.

The quoted provision of the Regulations has been held to be valid in *Commissioner* v. *South Texas Lumber Co.*, 333 U. S. 496, affirming 7 T. C. 609. In that case, the Court concluded that a taxpayer "can include in its equity invested capital only that portion of its profits from installment payments which it has actually received and on which it has already paid income taxes in the years of receipt." The reasoning of the Court, considered in the light of the quoted regulation, is applicable here and requires that the respondent be sustained. Under the *South Texas* decision, earnings and profits include only the portion of collected installment payments that represent income. If earnings and profits so computed are not sufficient to cover dividends, the amount of dividends in excess thereof is "not out of accumulated earnings and profits" and must reduce equity invested capital. A case that is very much in point is *White Bros. Co.* v. *Commissioner*, 180 F. 2d 451, in which the taxpayer had made distributions prior to 1930 which were in excess of accumulated earnings and profits unless such earnings and profits included unrealized profits from installment sales. The Court followed the *South Texas* case and held that unrealized profits on installment sales could not be included in earnings and profits for the years in which the distributions were made to stockholders.

The petitioner in these proceedings suggests that the *White Bros.* case is distinguishable in that in that case the taxpayer had regularly reported on the installment basis, whereas in this case the petitioner had regularly reported on the accrual basis and did not elect the installment basis until after enactment of the Revenue Act of 1926. We fail to see the distinction. When the petitioner filed amended returns which were accepted by the respondent, it put itself on the installment basis as to the particular sale here involved and as to such sale it must abide by all the consequences of installment reporting of income.

On this issue, we sustain the respondent in principle. After some vacillation on the part of the respondent as to the amount of reduction in invested capital as the result of the 1925 dividend, he concedes on brief that the amount is $56,347.56. This amount is agreed to by the petitioner if any adjustment is proper, and will be used in the Rule 50 computation.

### Issue 4. Relief Under Code Section 721.

#### FINDINGS OF FACT.

In the fiscal years 1944 and 1945, the petitioner owned citrus groves, all of which were located in the Indian River citrus section of Florida. Some of the groves were set out prior to July 1, 1933, and some after that date. Parts of the groves set out before that date are in the same sections of land as those planted later, and they adjoin each other.

Between the years 1933 and 1942, the petitioner planted approximately 158 acres of new citrus groves. Production from 12 acres of such plantings cannot be determined from existing records, and two 10-acre plantings made in 1942 had not produced by the taxable years. The claim for relief is based on production from the remaining 126 acres of the 158 acres of post-1933 plantings.

Citrus fruit plantings owned by the petitioner that had been made prior to 1933 amounted to 357 acres. Of these, a small acreage had been planted in 1921 and the balance in 1928. There were no further plantings until 1933. The pre-1933 plantings were tangerines, valencia and pineapple oranges, seeded grapefruit and March seedless grapefruit. By years, varieties, and acres, the post-1933 plantings were as follows:

| Year | Variety | Acres of oranges | Acres of grapefruit | Total acres |
|------|---------|------------------|---------------------|-------------|
| 1934 | Temple | 25 | | 25 |
| 1935 | Valencias | 10 | | 10 |
| 1936 | Pink M. S | | 10 | 10 |
| 1937 | | | | |
| 1938 | Jaffas | 10 | | 10 |
| | Parson Browns | 10 | | 10 |
| | Pineapples | 20 | | 20 |
| 1939 | Pineapples | 20 | | 20 |
| | Pink M. S | | 11 | 11 |
| | M. S | | 12 | 12 |
| 1940 | Pineapples | 10 | | 10 |
| 1942 | Red M. S | | 10 | 10 |
| | Red M. S | | 10 | 10 |

The petitioner capitalized the cost of planting, cultivating, fertilizing, spraying, and other miscellaneous expenses of newly planted trees for a period of from 4 to 6 years after the trees were set out. Thereafter, such expenses were charged to grove operating expenses. The cost of replacing trees that died was treated as an expense.

In order to keep citrus trees in proper condition for bearing, it is necessary that they be fertilized, cultivated, sprayed, and pruned under a year-round program. Cultivation and fertilization are somewhat more intense when the trees are young. In general, the same program is followed with respect to young trees as with old trees.

The groves set out by the petitioner in and after 1933 were planted on cleared land which previously had been used in the petitioner's farming operations. Comparatively little time was required to prepare the land and plant the trees. Some of the seedlings planted by the petitioner were raised and grafted in its own nursery, but the larger portion were purchased from outside nurseries after they had attained the proper age for planting.

The Lake Alfred Citrus Experiment Station, Lake Alfred, Florida, recommends that citrus growers use 6 pounds of 4 per cent nitrogen fertilizer per year for each box of fruit on the trees for the maximum

return from the use of fertilizer. The application of fertilizer is necessary in order to secure production of citrus fruit. Trees that have been neglected can be brought into production by the use of fertilizer and production will tend to increase until the recommended 6 pounds per year per box of fruit has been applied. Application of additional amounts will not result in a commensurable amount of additional fruit.

The quantity and quality of citrus fruit are greatly affected by weather conditions. Weather and other growing conditions were favorable during the 1943–1944 citrus season, contributing greatly to new highs in the production of oranges and grapefruit. A tropical hurricane struck Florida in October 1944, a result of which was to reduce prospective citrus production for the 1944–1945 season by an estimated 26.4 million boxes. Weather conditions after the hurricane were favorable, except for dryness, and the final outturn of the crop was only 23.6 million boxes below the October 1, 1944, estimate. Citrus production in Florida for the 1943–1944 season was 80,990,000 boxes from 369,600 acres. In the 1944–1945 season, production was 69,350,000 boxes from 374,800 acres.

A citrus tree in the Indian River section of Florida, from the time it comes into bearing at the age of 6 or 7 years, will tend to produce more fruit year by year until it reaches an age between 18 and 22 years. After that time, the trees, other conditions being equal, tend to level off in terms of per year box output. Trees 40 years of age bear more fruit than younger trees, but after the age of about 22 years the increase per year is not so rapid as in the case of trees below the age of 22 years.

Citrus prices are affected by a combination of weather conditions which affect both the quantity and quality of the fruit, the quantity and quality of fruit produced in other citrus-growing areas, the demand for citrus, and the purchasing power of the consumer. The competition of other kinds of canned and fresh fruits also affects the price of both canned and fresh citrus.

Following the entry of the United States into World War II, demand for fresh and processed fruit mounted rapidly. It soon exceeded domestic supplies despite sharp increases in production. Substantial quantities of surplus citrus fruits were purchased by the Government in the 4 years 1939–1940 to 1942–1943 for distribution through the food-stamp plan, school lunch programs, and other forms of public assistance. The last significant purchase of surplus citrus was in the season 1942–1943 when some 684,000 bushels of tangerines were purchased. By that time, the supply position of other citrus fruits had changed from surplus to inadequacy, because of sharply increased wartime demands.

After the signing of the Lend-Lease Act (March 11, 1941), requirements for citrus under that program and other foreign shipment were large. The requirements of the United States military and related war services increased yearly, especially for processed citrus. In addition, the demand of civilians in this country became even stronger.

Growers in the Indian River section market most of their fruit on the fresh fruit auction markets on the eastern seaboard, primarily in New York. Citrus producers in the Indian River section traditionally receive higher prices for their fruit than do growers in the central part of Florida. There tends to be more or less of a constant spread between the prices received by growers in the Indian River section and growers in central Florida. The prices received by Indian River citrus growers fluctuate up and down in direct relation to prices received by growers in other sections of Florida.

Maximum price regulations covered both fresh and processed citrus fruits at all levels of sale from the grower to the consumer during the period here involved. The regulations were established and administered by the Office of Price Administration. At the time price control was inaugurated in 1942, prices for citrus fruit were moving steadily upward. Grower prices were placed under control early in the 1942–1943 season, but the relatively high prices that were set permitted further price rises. The index of prices received by growers of citrus fruits (using 1935–1939 prices as 100) rose from 117 for the 1941–1942 crop to 168 for the 1942–1943 crop. It advanced to 192 for the 1943–1944 crop, and remained virtually at that point for the remaining two seasons of control.

The season averages of on-tree per-box prices for Florida citrus fruits for the seasons 1940–1941 to 1944–1945 were as follows:

|  | Year | All methods of sales | Sold for fresh use | Sold for processing |
|---|---|---|---|---|
| Oranges | 1940–41 | $0.79 | $0.82 | $0.60 |
|  | 1941–42 | 1.10 | 1.15 | .79 |
|  | 1942–43 | 1.74 | 1.81 | 1.40 |
|  | 1943–44 | 1.81 | 1.87 | 1.62 |
|  | 1944–45 | 2.21 | 2.23 | 2.18 |
| Grapefruit | 1940–41 | .33 | .42 | .27 |
|  | 1941–42 | | .73 | .54 |
|  | 1942–43 | .92 | 1.08 | .84 |
|  | 1943–44 | 1.31 | 1.34 | 1.30 |
|  | 1944–45 | 1.70 | 1.72 | 1.69 |

| Year | Tangerines | Sold for fresh use |
|---|---|---|
| 1940–41 | | $0.64 |
| 1941–42 | | 1.34 |
| 1942–43 | | 1.18 |
| 1943–44 | | 1.89 |
| 1944–45 | | 2.11 |

The petitioner's development costs on groves planted after 1933 were as follows:

| Year ended June 30 | Amount |
|---|---|
| 1934 | $6, 859. 90 |
| 1935 | 2, 230. 00 |
| 1936 | 1, 000. 00 |
| 1937 | 2, 500. 00 |
| 1938 | 4, 800. 00 |
| 1939 | 3, 950. 00 |
| 1940 | 7, 062. 00 |
| 1941 | 3, 964. 87 |
| 1942 | 5, 188. 00 |
| 1943 | 2, 235. 00 |
| 1944 | 2, 000. 00 |
| Total development cost | 41, 789. 77 |

During the fiscal years 1938 through 1945, the petitioner's production, average on-the-tree selling price, and gross sales of oranges, grapefruit, and tangerines from all of its groves were as follows:

| | Year ended June 30 | Boxes produced | Average price per box | Gross sales |
|---|---|---|---|---|
| Oranges | 1938 | 15, 640 | $1. 03 | $16, 107. 35 |
| | 1939 | 19, 772 | 1. 03 | 20. 396. 64 |
| | 1940 | 16, 396 | 1. 33 | 21. 811. 10 |
| | 1941 | 19, 795 | . 94 | 18, 703. 42 |
| | 1942 | 14, 537 | 1. 09 | 15, 834. 88 |
| | 1943 | 18, 040 | 1. 89 | 34, 101. 14 |
| | 1944 | 24, 279 | 2. 40 | 58, 277. 60 |
| | 1945 | 34, 408 | 2. 77 | 95, 352. 77 |
| Grapefruit | 1938 | 32, 020 | $1. 13 | $36, 037. 64 |
| | 1939 | 45, 886 | . 58 | 26. 578. 47 |
| | 1940 | 25, 029 | 1. 22 | 30. 441. 19 |
| | 1941 | 32, 295 | . 43 | 13, 943. 21 |
| | 1942 | 32, 133 | . 84 | 26, 922. 69 |
| | 1943 | 42, 553 | 1. 55 | 66, 134. 61 |
| | 1944 | 37, 095 | 1. 76 | 65, 360. 39 |
| | 1945 | 54, 463 | 2. 52 | 137, 289. 76 |
| Tangerines | 1938 | 6, 830 | $. 72 | $4, 920. 00 |
| | 1939 | 5, 276 | 1. 22 | [1] 2, 839. 24 |
| | 1940 | 4, 779 | . 74 | 3, 517. 40 |
| | 1941 | 6, 444 | . 74 | 4, 762. 99 |
| | 1942 | 5, 069 | 1. 23 | 6, 216. 66 |
| | 1943 | 5, 209 | 1. 57 | 8, 156. 23 |
| | 1944 | 4, 170 | 2. 31 | 9, 646. 85 |
| | 1945 | 3, 846 | 1. 53 | 5. 897. 54 |

[1] Figure as shown in an exhibit admitted in evidence. The correct figure apparently should be $6,436.72.

During the fiscal years 1938 through 1945, the petitioner's production, average on-the-tree selling price, and gross sales of oranges and grapefruit from 126 acres set after July 1, 1933, upon which abnormal income is claimed, were as follows:

| | Year ended June 30 | Boxes produced | Average price per box | Gross sales |
|---|---|---|---|---|
| Oranges | 1938 | 1, 199 | $1. 03 | $1, 234. 97 |
| | 1939 | 2, 902 | 1. 03 | 2, 989. 06 |
| | 1940 | 2, 372 | 1. 33 | 3, 154. 76 |
| | 1941 | 4, 041 | . 94 | 3, 798. 54 |
| | 1942 | 3, 452 | 1. 09 | 3, 762. 68 |
| | 1943 | 5, 335 | 1. 89 | 10, 083. 15 |
| | 1944 | 9, 786 | 2. 40 | 23, 486. 40 |
| | 1945 | 10, 841 | 2. 77 | 30, 029. 57 |
| Grapefruit | 1938 | None | | |
| | 1939 | None | | |
| | 1940 | 64 | 1. 22 | 78. 08 |
| | 1941 | 495 | . 43 | 212. 85 |
| | 1942 | 609 | . 84 | 511. 56 |
| | 1943 | 1, 045 | 1. 55 | 1, 619. 75 |
| | 1944 | 964 | 1. 76 | 1, 696. 64 |
| | 1945 | 3, 206 | 2. 52 | 8, 079. 12 |

During the fiscal years 1940 to 1945, inclusive, the petitioner's direct production costs on all groves, and the direct production costs applicable to the 126 acres planted after July 1, 1933, with respect to which abnormal income is claimed (allocated in the ratio that 126 acres bears to 515 acres) were as follows:

|  | 1940 | 1941 | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|---|---|
| Total | $24,957.27 | $24,628.27 | $26,601.60 | $31,991.12 | $45,091.98 | $59,002.19 |
| Allocable to 126 acres | 6,106.05 | 6,025.56 | 6,508.35 | 7,826.95 | 11,032.21 | 14,435.49 |

The petitioner's annual production, in boxes of fruit, for the fiscal years 1938 through 1950 from a grove purchased in 1946, from groves set prior to June 30, 1933, from groves set after July 1933, and total production from all groves, were as follows:

| Year | Groves purchased in 1946 | Groves set | | Total |
|---|---|---|---|---|
|  |  | Prior to 6/30/33 | Subsequent to 7/1/33 |  |
| 1938 |  | 53,291 | 1,199 | 54,490 |
| 1939 |  | 68,032 | 2,902 | 70,934 |
| 1940 |  | 43,768 | 2,436 | 46,204 |
| 1941 |  | 53,998 | 4,536 | 58,534 |
| 1942 |  | 47,678 | 4,061 | 51,739 |
| 1943 |  | 59,422 | 6,380 | 65,802 |
| 1944 |  | 54,794 | 10,750 | 65,544 |
| 1945 |  | 78,670 | 14,047 | 92,717 |
| 1946 |  | 61,593 | 16,420 | 78,013 |
| 1947 | 7,461 | 79,155 | 21,002 | 107,618 |
| 1948 | 5,142 | 67,663 | 22,962 | 95,761 |
| 1949 | 11,354 | 85,248 | 23,399 | 120,076 |
| 1950 | 8,296 | 61,634 | 19,766 | 89,690 |

The petitioner's groves are cultivated and maintained in accordance with normal and standard practice, and their condition is in line with good, average groves in the Indian River section.

The number of tons of fertilizer used on all of the petitioner's groves for the fiscal years 1941 through 1945 were as follows:

*Year ended June 30* — *Tons*

1941 — 302
1942 — 323
1943 — 408
1944 — 428
1945 — 414¼

The petitioner's gross income for the fiscal years ended June 30, 1944 and 1945, from the sale of citrus fruit produced on the 126 acres of new groves planted subsequent to 1933 amounted, respectively, to $25,183.04 and $38,108.69.

The petitioner's gross income from the sale of citrus fruit for the fiscal years ended June 30, 1944 and 1945, produced on 126 acres of new groves planted after July 1, 1933, was in excess of 125 per cent

of the average gross income from the same 126 acres for the four preceding years to the extent, respectively, of $17,926.36 and $23,992.58.

OPINION.

The petitioner claims that in the fiscal years ended June 30, 1944 and 1945, it had net abnormal income within the meaning of Internal Revenue Code section 721 (a) and, therefore, is entitled to relief under section 721 (c).

Section 721 (a) (1) defines abnormal income as being either income of a class that is abnormal in the case of the taxpayer, or if it is a class from which the taxpayer normally derives income, then if it is in excess of 125 per cent of the average amount of that class for the four previous taxable years. The petitioner claims to come within the latter portion of the definition as its income in the years 1944 and 1945 was of the same class as in previous years, that is, from the sale of citrus fruit produced by it on its property. Section 721 (a) (2) contains several subparagraphs each of which describes a separate class of income. The petitioner's claim is founded on that portion of subparagraph (C) which reads:

(C) Income resulting from * * * development of tangible property * * * extending over a period of more than 12 months; * * *.

In the case of *Primas Groves, Inc.*, 15 T. C. 396, it was assumed, without decision on the point, that the taxpayer had shown that its income from the production and sale of citrus fruit constituted a class of abnormal income under Code section 721. Relief was not granted in that case because of the failure to show what part of the net abnormal income was attributable to prior years. We assume here that income from the sale of citrus fruit grown by the petitioner is income from the development of tangible property, though the point has not been decided and we do not decide it in these proceedings.[1]

The basic requirement of that part of Code section 721 under which claim is made by the petitioner is that the income of the class as to which abnormality is claimed "is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years * * *." We think that the petitioner has failed to meet this requirement. The claim for relief is limited to the income derived in 1944 and 1945 from sales of citrus fruit produced by groves planted after July 1, 1933, on 126 acres of land. These 126 acres were part of a total of 158 acres planted after that

---

[1] Under decisions of the Florida courts, though citrus trees are *fructus naturales,* hence realty, the fruit is *fructus industriales* and subject to mortgage as chattels. *Gentile Brothers, Inc.* v. *Bryan,* 107 Fla. 233, 133 So. 630, *Haines City Citrus Growers' Ass'n* v. *Petteway* (Fla.), 145 So. 183. Of course, the classification of property under local law is not necessarily determinative as to the treatment of income from property for Federal tax purposes. *Burnet* v. *Harmel,* 287 U. S. 103.

date, but of which 20 acres had not come into production, and as to 12 acres of which the income could not be determined. The 158 acres in turn were part of total citrus grove plantings of 515 acres, of which 357 had been planted prior to 1933. On these facts, we do not see how the income resulting from the production on 126 acres can be singled out and set apart from the income from other acres constituting part of the groves under the 125 per cent provision of section 721 (a) (1). There is nothing in the record which gives any reason for the separation of the 126 acres from the petitioner's other grove acreage. The trees on some of the acreage had been planted earlier but, according to the evidence, they had not passed the maximum bearing age by the taxable years. In fact, some of them, just as those in the 126 acres, had not attained the age of maximum fruiting which begins at the age of 18 to 22 years. The fruits were of the same kind—oranges, grapefruit and tangerines—in all of the groves. All groves were within a comparatively small area in the same general vicinity. Some of the tracts planted prior to July 1, 1933, bordered directly on those that were planted after that date. All groves were apparently given the same treatment of cultivation, spraying, fertilization, and pruning. In short, the income from all of the petitioner's groves appears to be the class that the petitioner "normally derives" within the meaning of section 721 (a) (1). Where income is all of the same class, the statute would seem to require that all of such income be compared with all of the income for previous years in order to determine whether the excess of 125 per cent test is met. There is no warrant in the provisions of section 721 for breaking down income of the same class into segments based merely on a particular date of acquisition or development of property. If the petitioner's view were carried to its logical conclusion, the operator of a fruit orchard would be entitled to separate its gross income acre by acre, or even tree by tree, and make a comparison on that basis for the purpose of determining whether it met the 125 per cent test. Such separation would not result in making the income from each unit a "separate class of income" upon which a relief allowance may be predicated. *Rochester Button Co.*, 7 T. C. 529, 551. No more do we think that the carving out of a particular block of acreage from a larger acreage, based purely on the date of planting, establishes for that block a separate class of income. No claim is here made that the income from all of the groves in the taxable years meets any of the tests of abnormal income.

The facts distinguish this case from several in which it has been found that there was a separate class of income which, with the establishment of other statutory factors, resulted in the granting of relief. In *Rochester Button Co.*, *supra*, the income as to which relief was granted resulted from research conducted by the taxpayer from which emerged buttons with a basically different chemical structure than

others produced and sold by it. In *Lindstedt-Hoffman Co.*, 11 T. C. 584, there was a separate class of income from premiums on performance bonds which were written on a different basis and for a different length of time than other bonds written or placed by the taxpayer. In *Morrisdale Coal Mining Co.*, 13 T. C. 448, the income in respect of which relief was granted was from mines which were separate and in no way connected with other mines operated by the taxpayer, the coal was of a different quality, and the methods of operation were different. In this case we are unable to find any ground which would differentiate the product, or the income, from the 126-acre block from the product of, or the income derived from, the petitioner's other groves.

The petitioner has submitted computations of amounts that it deems to represent net abnormal income to be attributed to prior years. The respondent objects to any relief allowance, but in the event that any relief is granted he urges the adoption of a different method of computation which results in much less relief than is shown by the petitioner's figures.

For reasons given above, we are unable to find that the petitioner had a separate class of income that qualifies for treatment as abnormal income. It follows that we do not reach the point of deciding the amount of net abnormal income or the portion thereof that might be attributable to other years.

Reviewed by Special Division as to section 721 (a) (2) (C).

*Decisions will be entered under Rule 50.*