MORRISDALE COAL MINING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16270. Promulgated September 30, 1949.

*George E. H. Goodner, Esq.,* and *Scott P. Crampton, Esq.,* for the petitioner.

*Karl W. Windhorst, Esq.,* for the respondent.

OPINION.

Van Fossan, *Judge*: The petitioner contends that its income for 1943 from the Maxton Slope Mine was income of a separate class

454

within the purview of section 721 (a) (2) (C) of the Internal Revenue Code;[1] that such income was abnormal to the extent of $150,855.90, the amount by which petitioner's 1943 gross income exceeded 125 per cent of its gross income from this class during the four preceding years; and that its net abnormal income, as defined in section 721 (a) (3),[2] of $92,594.02 is attributable to the prior years 1940, 1941, and 1942.

The respondent contends that the income derived under each lease should have been segregated, since the two properties acquired under separate leases are separate properties. Sec. 35.721–7 of Regulations 112, as interpreted in Mim. 6082, 1946–2 C. B. 95.

Section 35.721–7 of Regulations 112, relating to section 721 (a) (2) (C) of the Internal Revenue Code, provides, in so far as pertinent, as follows:

SEC. 35.721–7  *  *  *  The second class of potentially abnormal income specifically set forth in section 721 (a) (2) is income resulting from exploration, discovery, prospecting, research, or development of tangible property (such as mines, oil producing property, and timber tracts),  *  *  *  extending over a period of more than 12 months.  *  *  *

An item of income resulting from exploration, discovery, prospecting, research, or development is all such income for the taxable year arising out of a unit of property such as an oil lease or other mineral property defined in section 29.23 (m)–1(i) of Regulations 111  *  *  *.

---

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

*       *       *       *       *       *       *

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months ; or

*       *       *       *       *       *       *

[2] (3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary.

*       *       *       *       *       *       *

Section 29.23 (m)–1 of Regulations 111, relating to depletion, provides as follows:

(*i*) "The property," as used in section 114 (b) (2), (3), and (4) and sections 29.23 (m)–1 to 29.23(m)–19, inclusive, means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate "property"; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property," provided such treatment is consistently followed.

A "mineral property" is defined in section 29.23 (m)–1 (*b*) of Regulations 111 as:

* * * the mineral deposit, the development and plant necessary for its extraction, and so much of the surface of the land only as is necessary for purposes of mineral extraction. * * *

The respondent made a similar contention in *Black Mountain Corporation*, 5 T. C. 1117. In that case the taxpayer had acquired three coal properties in 1909, 1911, and 1917, respectively, and numerous smaller ones thereafter, which were all contiguous. The Commissioner contended that each separate acquisition of coal lands gave the taxpayer a separate property for the purpose of computing the deduction of percentage depletion. The taxpayer contended that "the property," as used in section 114 (b) (4), meant the economic and practical unit which the taxpayer must use and develop in order to extract a particular block of coal, i. e., whatever portion of the mineral deposit can be properly mined as a unit, also the development, plant, and surface land necessary for the extraction of that particular block of coal. The determination of the question in that case, as herein, revolved upon the meaning of the word "property." The Tax Court, after considering article 23 (m)–1 (*b*) and (*j*) of Regulations 94, containing substantially the same definitions of "the property" and "mineral property" as contained in section 29.23 (m)–1 (*b*) and (*i*) of Regulations 111, and various cases, including *Allie M. Turbeville*, 31 B. T. A. 283; affd., 84 Fed. (2d) 307; certiorari denied, 209 U. S. 581, and *Vinton Petroleum Co. of Texas*, 28 B. T. A. 549; affd., 71 Fed. (2d) 420; certiorari denied, 293 U. S. 601, cited by the respondent herein, stated, in part, as follows:

The regulations and decided cases support the petitioner's contention. * * *

* * * * * * *

We are unable to see the necessity for the Commissioner's contention that every separate acquisition of coal lands must be treated as a separate property for the purpose of computing percentage depletion. Separate acquisitions can, under proper circumstances, be combined to form one property and, likewise, under proper circumstances, one acquisition may become a part of two different properties for this purpose. We hold for the petitioner on this point. * * *

See also *Gifford-Hill & Co.*, 11 T. C. 802, wherein the respondent made the contention that each tract of land, or lease, constituted a "mineral property" within the meaning of section 735 (b) of the Internal Revenue Code and section 35.735-2 (f) of Regulations 112. This Court held (p. 815) that the:

\* \* \* part of respondent's regulation which provides that "If the mineral deposit in which a taxpayer owns an economic interest extends beyond the boundaries of a single tract or parcel of land a separate mineral property exists with respect to each tract or parcel of land into which the mineral deposit extends" does not correctly interpret the language of the statute as expressed in subsection (a) (6) of section 735, and is invalid.

The properties leased under the two leases involved herein were contiguous, the coal in each was known as the "B" seam or Lower Kittanning seam, running at approximately the same level below the surface, and the coal in the Philipsburg Coal & Land Co. property was extracted and removed through the developments and the slope on the Maxton Coal Co. property. In our opinion, the two properties, under the circumstances disclosed, constituted one property. Since the development extended over a period of more than 12 months, the income derived therefrom, resulting from its development, is within the classification of section 721 (a) (2) (C).

We are not bound by the interpretation of the word "property" contained in Mim. 6082,[3] *supra*, issued November 5, 1946, upon which respondent relies to support his contention. *Helvering* v. *New York Trust Co.*, 292 U. S. 455; *Cole* v. *Commissioner* (CCA-9), 81 Fed. (2d) 485; *Ellen Ayer Wood*, 29 B. T. A. 1050.

It is also contended by respondent that the income derived from the Maxton Slope Mine constituted merely one item of a class of income. He argues that the petitioner has been engaged in the mining of bituminous coal since 1932; that "operation of all the mines was the same except that the only mechanized mine was the Maxton Slope Mine"; that all the bituminous coal, regardless of its source, which was mined by the petitioner was necessarily the result of exploration and development in prior years by someone; that, presumably, all these other properties were developed during a period of over 12 months; and that, therefore, "the income received therefrom is of the class de-

---

[3] Mim. 6082, relating to "Development period of oil properties in conection with the application of section 721 (a) (2) (C) of the Internal Revenue Code," is, so far as material, as follows:

"\* \* \* Some taxpayers have claimed that for the purpose of section 721 (a) (2) (C) of the Code all of the producing property should be considered one property. For excess profits tax purposes, the Bureau, as indicated in section 35.721-7 of Regulations 112, has considered an oil lease as an example of a unit of property. While there has been some ambiguity in the use of the term 'property,' there is nothing to indicate that any unit larger than a lease was contemplated by Congress. The determination of the development period of a property is, therefore, based on the conception of a lease or individual tract as 'the property.'"

scribed in section 721 (a) (2) (C) to the same extent that income from the Maxton Slope Mine ("B" Seam) might be of that class."

Section 721 (a) (2) in each of its lettered subparagraphs describes "a separate class of income." The "separate class of income" described in subparagraph (C) is "Income resulting from exploration, discovery, prospecting, research, or development of tangible property, * * * extending over a period of more than 12 months." The income derived by the petitioner in 1943 from the Maxton Slope Mine, in so far as it resulted from development, which development extended over a period of more than 12 months, falls clearly within that definition. Thus under the statute it is a "separate class of income" and not "one item of a class of income" as contended by the respondent.

Moreover, the other mines operated by petitioner were separate mines and in no way connected with the Maxton Slope Mine. The coal was not of the same quality. The other mines were not mechanized mines, as was the Maxton Slope Mine. All of them had been for some time in the production stage. In fact it was thought in 1940 that the coal in such mines would be exhausted in the near future.

*Rochester Button Co.*, 7 T. C. 529, cited by respondent, does not support his position that the income derived from the Maxton Slope Mine constituted merely one item of a class of income, but rather the contention of petitioner that the income from that mine constituted income resulting from its own exploration and development of tangible property and hence a class of income within section 721 (a) (2) (C).

In that case the taxpayer was, and had been since 1926, engaged in the manufacture and sale of buttons used largely in the clothing trade. Upon its incorporation in April 1926 it acquired certain assets, including the name and business of the predecessor Rochester Button Co., organized in 1904, and the assets and business of two other corporations, organized in 1920 and 1924, respectively, all three of which had been theretofore engaged in the manufacture and sale of buttons. Research commenced by taxpayer in 1930 resulted in the development of five different types of buttons. The income received in the taxable year from four of such buttons was in excess of 125 per cent of the average base period income derived from such buttons, whereas the income received from the fifth button fell below 125 per cent of the average base period income by approximately $19,000. The taxpayer argued that the exclusion should be the total shown for the four buttons only, whereas the respondent insisted that the $19,000 should be deducted and the remaining net excess from the five buttons should measure the outer limit of permissible relief. The Tax Court held that, since all five types of buttons resulted from the research and development, the income received from all of them must be taken into consideration in computing the amount of the abnormal income under

section 721 (a) (1). It is, in discussing this question, that the Tax Court stated:

> * * * Nowhere does the legislation refer to individual items within a class. The abnormal income is defined only by reference to the total derived from any class. * * *

However, and notwithstanding that the taxpayer had a gross profit in the taxable year in excess of $1,187,000 from the manufacture and sale of *buttons*, the Tax Court held that the receipt of the part of such gross income, approximately $280,700, from the manufacture and sale of the five types of *buttons* developed from its own research, entitled the taxpayer to relief under section 721 (a) (2) (C).

It is not important that the petitioner had other income derived from the extraction and sale of coal. The determining factor is that the income from the Maxton Slope Mine constitutes income resulting from petitioner's own exploration and development of such property extending over a period of more than 12 months and that the gross income therefrom in the taxable year was in excess of 125 per cent of the average amount of the gross income of the same class for the four previous taxable years.

The respondent in his brief states that the record does not disclose how figures contained in petitioner's computation of net abnormal income, viz., direct cost of $89,074.26 and cost depletion of $1,019.55, were arrived at by petitioner. These amounts were shown in the original claims for refund filed May 24, 1945. Petitioner's accountant testified that the figures in the computation were taken from the petitioner's books and records and tax return as filed and the revenue agent's changes thereon; that if called upon to do so, he could show by reference to the books in the court room where each figure came from. After cross-examination of the witness, counsel for respondent reserved the right to recall the witness for further questioning with respect to the computation submitted, but did not do so. Under the circumstances, "the burden of going forward with any possible contradictory material reasonably fell upon respondent." *Rochester Button Co., supra.*

Section 35.721–3 of Regulations 112 provides, in part, as follows:

> * * * To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for or decreased competition in the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus no portion of an item is to be attributed to other years if such item is of a class of income which is in excess of 125 per cent of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions. * * *

The above provisions of the regulation were approved in *Soabar Co.,* 7 T. C. 89. The evidence shows that the 1943 average selling price

per ton was greater than the 1942 average selling price per ton. Part of the increase in selling price was accounted for by an increase in the cost of production in 1943, leaving an increase to the extent of 6.45 cents in 1943 average selling price over 1942 average selling price. There being no evidence to the contrary, such increase was due to higher prices or improvement in business conditions. Under the regulations, therefore, to that extent the net abnormal income of $92,594.02 may not be attributed to prior years and must be reduced accordingly before allocation to prior years upon recomputation under Rule 50.

Reviewed by Special Division.

*Decision will be entered under Rule 50.*

---

Disney, *J.*, dissenting: The majority conclude that the petitioner had net abnormal income from the sale of coal from the Maxton Coal Mine because it concluded that the income from the coal sold from that mine was a "separate class of income" under section 721 (a) (2) (C) of the Internal Revenue Code. I can not agree.

I note at once that the petitioner contends for an abnormality to the extent of the excess above 125 per cent of average gross income of the same class. Therefore, it is beyond question that the petitioner does not claim that the abnormal income here involved means income abnormal in nature or type—for if it had so claimed, the petitioner would not limit its claim to the excess above 125 per cent. I, therefore, also note that section 721 (a) (1), in effect, defines such income abnormal in nature or type as such that "it is abnormal for the taxpayer to derive income of *such class.*" In short, the petitioner in limiting its claim to abnormality of income, to excess over 125 per cent, appears to admit that the income from the Maxton Mine was of the same class as it had previously produced—since otherwise petitioner would have claimed complete abnormality. We, therefore, see the petitioner in the position of tacitly agreeing that the income from the Maxton Mine in 1943 is not different in class from what it had earlier produced, but nevertheless see the petitioner contending that the income from the Maxton Mine coal constituted a class by itself because the petitioner wishes to calculate the 125 per cent, not upon the average gross income of all of its coal for the four previous years (which, we have just seen, it impliedly admits is of the same class as the Maxton coal) but wishes to calculate the 125 per cent upon the Maxton Mine coal only, because in that way it can produce a small figure to substract from the gross income from the Maxton Mine in 1943, and thus arrive at a higher "net abnormal income." This is our pivotal question: "Is the 125 per cent to be calculated solely upon Maxton Mine coal for the four previous years, or upon all of the coal produced by the petitioner, a coal mining company?

The petitioner contends, and the majority agree, that the claim should be allowed merely because of the text of section 721 (a) (2) (C), which, in substance, says that "Income resulting from exploration, discovery, prospecting, research, or development of tangible property * * * over a period of more than 12 months" is a "separate class of income." Aside from the illogic, above seen, in petitioner's failing to claim complete abnormality in 1943 if the gross income for that year was not of the same class as its previous and normal income, it seems to me that the majority conclusion is without sufficient basis, for two reasons:

(1) The expression "Income resulting from exploration, discovery, prospecting, research, or development of tangible property," in my view, does not, as the majority seems to conclude, mean that income resulting from exploration, etc., of a certain piece of property, comprises a separate class. Such a holding appears to me to place all the emphasis upon "property" and, in effect, says that each property produces a separate class of income. I do not think it was intended by Congress that a coal mining company, developing a coal mine, should be considered to be producing a separate class of income just because it is a new mine. Of course, if it was a gold mine, a new proposition with that company, it would come within the idea of abnormality in type, but if the company is merely continuing to develop coal mines, the mere fact that a new mine is a new "property" does not, as I see it, control. Yet the majority so allows, apparently merely because, under the text, there is income resulting from exploration, etc.; but more broadly read the language means that *all* income resulting from exploration, etc., of tangible property (not "a tangible property") constitutes "a separate class of income"; and, in my view, that is just what this coal mining company had been doing for a number of years—exploring, discovering, prospecting, and developing tangible property. In my opinion, therefore, it was doing nothing new in class in 1943 merely because it had a new mine or single "property." It was merely continuing to have, as it had had for several years, income resulting from exploration, development, etc., of coal mines. I think the petitioner and the majority opinion view the language too narrowly, that the income from such coal mining work in 1943 was in no separate class from what it had been in previous years, and that by failing to claim complete abnormality in 1943 petitioner has recognized the identity in class between the income of 1943 and previous years. Therefore, I would apply the 125 per cent not merely to the average gross income of the Maxton Mine, but to all of petitioner's coal mines for the four previous years.

(2) The impropriety of doing otherwise and applying the 125 per cent to Maxton Mine gross income only is demonstrated, I think,

by the fact that, despite the fact that the Maxton Mine was acquired in June 1940 and indeed no coal was taken from it until 1941, and despite the fact that petitioner's own computation is upon the basis that gross profit from the Maxton Mine was "none" for 1939, 1940, and 1941, nevertheless these three years of no gross profit are used in obtaining the 4-year average. In short, gross profit of $15,759.71 for 1942 is averaged with "none" for 1939-40-41 to arrive at a 4-year average of $3,939.93—from which at 125 per cent petitioner gets $4,924.91, which alone it subtracts from the $155,780.81 gross profit for 1943 and arrives at "abnormal income" for that year of $150,855.90. It is quickly obvious that there is no logic in arriving at gross profit for the Maxton Mine by using 2 years when it did not produce at all, and one year, 1939, before it had even been acquired. Such an average is certainly not any real average for the Maxton Mine. Such procedure, moreover, seems altogether inconsistent with the object of the statute as brought out in section 721 (c), which provides a way of "computation of tax for current taxable year" and, in effect, provides that it shall not exceed the tax for the taxable year computed without the inclusion in gross income of the portion of net abnormal income "which is attributable to any other taxable year" and the aggregate of the increase in the tax for the taxable year and for each previous taxable year which would have resulted if for such previous year "to which any portion of such net abnormal income is attributable" an equal amount had then been included. In effect, the result of the statute is as if the abnormality found in the taxable year is spread over the previous years *to which it is attributable*. There can be no doubt of this, for the language "attributable to any previous taxable year or years" is found in section 721 as the excess profits law was enacted in the Second Revenue Act of 1940, and the Committee Report of the Ways and Means Committee (77th Cong., 1st sess., H. Rept. 146)—with reference to the Revenue Act of 1941—states as follows:

4. Existing law provides for adjustments with respect to six specific classes of abnormal income received during the taxable years subject to the excess-profits tax. These specific items were allowed to be spread over the years to which they are actually attributable. * * * (pp. 2–3)

* * * If abnormal income falling within any one of these six described classes is received by the taxpayer it is provided that such income should be allocated to the taxable years to which it is attributable * * *. (pp. 9–10)

Again (pp. 9–10), we find:

* * * The mere fact that an item includible in the gross income of the taxpayer is abnormal, or is in excess of 125 percent of the average amount of the gross income of the same class for the test period, does not result in the exclusion of such item from excess-profits net income. It is necessary that the item be found attributable to other taxable years. * * *

This is consistent with what we held in *Southwestern Oil & Gas Co.*, 6 T. C. 1124, 1133, where, in accordance with the regulations, we said

that the abnormal amount (after certain adjustments not here involved) "should be 'attributed to the taxable years during which expenditures were made for the particular exploration, discovery, prospecting, research, or development which resulted in such item being realized * * *,' as contemplated by the regulations quoted above." I do not see how on the theory of a separate class of income for the Maxton Mine any abnormality of income, limited to the Maxton Mine as the majority treats it, can be attributable to years before that mine was acquired—1939 and until June 1940—and such treatment seems to me to demonstrate the falsity of the petitioner's theory that there was "a separate class of income" over such 4-year period. Moreover, during 1939 and 1940 there was no income at all from the Maxton Mine and during 1941 gross profit was "none"; and petitioner's only gross income and therefore the only gross income which could possibly have been "of the same class" as that for 1943, during 1939–1941, was the income from other mines—and, in my view as above expressed, it was truly of the same class as that produced in 1943. A coal mining company habitually opening and developing coal mines incurs no abnormality, in my opinion, merely by opening another. This view was taken in the Congressional discussion in the Senate during the passage of section 721. Senator Adams, quoting the general provision as follows: "and, in the light of the taxpayer's business, it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class, the item includible in the gross income of the taxable year is grossly disproportionate to the gross income of the same class in the 4 previous taxable years," added "If we are dealing with mines, I suppose that means the average of a group of mines, or mines generally, rather than a particular mine," to which Senator Harrison answered "That is correct." A little later Senator Harrison quoted from a report from Mr. Stam, Chief of Staff, as follows: "An oil company might derive income from an oil well in 1940, which is much greater than it received in the 4 preceding taxable years for oil *wells* * * *." (Italics mine.) See Seidman's Legislative History of Excess Profits Tax, pp. 128–129. Is it not clear that the Senators considered that abnormality of income from a mine or oil well was to be found by comparison not with the experience from that particular mine or well, but from the previous experience of the taxpayer with other mines or wells? Such discussion on the floor of Congress is, of course, not conclusive, but it is obviously enlightening.

The view of the majority means that the operator of a new mine after 12 months of development can compute net abnormal income by deducting from the income therefrom 125 per cent of the amount of the gross income therefrom prior to the 12-month period, divided

by 4, though it had gross profit from such mine in only one previous year—provided only that it was in existence during the 4 years, even though it had not owned the particular mine more than a small part of the 4 years. For instance, if it acquired a mine prior to June 30 of a year and during the rest of that year explored, prospected, and discovered mineral thereon, but with very small gross profit, and it then continued the exploration, prospecting, research, or development for another 12 months, with great gross income, it could, under the majority view, spread the very small gross income from the first 6 months over a period of 4 years by dividing it by 4, deduct 125 per cent of the small figure obtained, from the gross income for the 12 months, and have the remainder, practically the entire gross income, for deduction as abnormal—all despite the fact that this was not "in the light of the taxpayer's business"—to use the language of the committee reports—for any 4-year period, and despite the clear intent of the statute to spread taxability of net abnormal income only so far as it is attributable to former years. I can not subscribe to such a result, and I think it emphasizes the error in the majority view. I respectfully dissent.