SIMPSON RICHEY, AS TRANSFEREE OF ASSETS OF WADE AND RICHEY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ROBIN ADAIR WADE, AS TRANSFEREE OF ASSETS OF WADE AND RICHEY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LILLIAN PEARL WADE, AS TRANSFEREE OF ASSETS OF WADE AND RICHEY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GENEVIEVE MAE LEE, AS TRANSFEREE OF ASSETS OF WADE AND RICHEY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24966, 24967, 24968, 24971. Promulgated March 4, 1953.

*Frontis H. Moore, Esq.*, for the petitioners.
*S. Earl Heilman, Esq.*, for the respondent.

## OPINION.

ARUNDELL, *Judge:* There was originally an issue in each of these proceedings as to whether the petitioners were liable as transferees of Wade and Richey, Incorporated, for any deficiency in the taxes of that corporation. The parties have stipulated figures which disclose that, as stockholders of the corporation, each of the petitioners upon dissolution of the corporation received from it net assets of a value in excess of the amount of the deficiency determined by the respondent. The petitioners are therefore liable as transferees for any deficiency that may result from our decision on the excess profits tax issue.

In its excess profits tax return for the year 1940, Wade and Richey, Incorporated, reported a net profit from sales of brown ore in the amount of $53,261.41 of which it deducted $22,780.27 as being net abnormal income which was attributable to prior years. The respondent disallowed the deduction and the petitioners allege that he erred in that disallowance. On amended petitions it is now claimed that the amount of net abnormal income was either $38,825.13 or $45,670.05, dependent on the method of computation.

The corporation of Wade and Richey, Incorporated, was engaged in the mining of brown iron ore and the quarrying of dolomite. The parties are agreed that the two operations were separate. The claim in these proceedings rests entirely on the brown ore mining operations. The evidence establishes that the corporation, as the result of its prospecting on the land leased from the Republic Steel Corporation, discovered the extensive iron ore deposit that became known as the Big Pit. As the result of that discovery, the corporation's production of ore and its income were considerably higher in 1940 than in the two preceding years in which it was in existence.

The respondent's objection to any allowance for abnormal income is based on two grounds. First, that there was no abnormal income within the meaning of section 721 (a) (2) (C) of the Internal Revenue Code. Second, that if there was abnormal income, the petitioners have not shown that it was attributable to 1938 and 1939.

Section 721 (c) of the Code provides for the exclusion from income of the current year of the net abnormal income that is attributable to other taxable years. Section 721 (a) (2) (C) recognizes as a sepa-

rate class of income the income resulting from exploration and/or prospecting extending over a period of more than 12 months. Even though a taxpayer is engaged in mining, the income that results from prospecting is a separate class of income under section 721. *Morrisdale Coal Mining Co.*, 13 T. C. 448. The net abnormal income is excludible if the abnormal income exceeds 125 per cent of the average amount of gross income of the same class for the four previous years, or if the taxpayer was not in existence for that number of years, then for the years in which it was in existence. Code section 721 (a) (1).

We think that the corporation has met the tests prescribed by the statute.

The respondent's arguments to the contrary are not convincing. He contends that the petitioners have confused gross income from brown ore with income resulting from exploration, discovery, etc., of tangible property, citing *Eitel-McCullough, Inc.*, 9 T. C. 1132. In that case, we pointed out that the taxpayer's income was due to a number of factors, and the evidence did not establish separately the part that was due to research and development and the part that was the result of other factors. We said in that case, in part:

The statute by its terms requires identification of a "class" of income, either of any class described in subsections (a)(2)(A) to (F), inclusive, or of some other class under the regulations prescribed by the Commissioner with the approval of the Secretary.

The corporation in this case has elected to come under the class described in subsection (C) of section 721 (a) (2). It kept separate from its other operations the operations which it claims bring it under that subsection. The exploration and prospecting operations, and the resultant income, are thus identifiable, and in this respect the present case is distinguishable from that of *Eitel-McCullough, Inc., supra*.

The respondent's argument places stress on the two methods used by the corporation in prospecting for ore. In 1938 and in the early months of 1939, the corporation prospected by the open pit method. It found some ore pockets by that method. The indications were that there was a more extensive deposit, but it could not be reached by the digging of open pits. The corporation then, in 1939, purchased and began the use of a Keystone drill which was capable of sinking holes to a much greater depth than the open pits which were dug by hand. Within a few months—less than 12—the corporation blocked out the Big Pit and thereafter mined and sold ore from it.

The statute does not prescribe that exploration or prospecting shall be confined to any particular method. Here, although the corporation changed its method of prospecting from hand digging to machine drilling, the prospecting was continuous throughout the year 1938 and well into 1939 before it discovered the deposit which resulted in

increased income in 1940. Prospecting has been defined as the "searching for new deposits * * *."[1] We know of no definition that restricts prospecting to a particular method.

The respondent also argues that at least some part of the income realized in 1940 was due to an increased price for ore and that such part is not to be attributed to prior years, citing Regulations 109, section 30.721–8, and *Southwestern Oil & Gas Co.*, 6 T. C. 1124, 1132. The respondent's basic position is sound. But the fact that some part of the increased income is due to an increased price does not preclude allocation of the remainder of the abnormal income to prior years. *Southwestern Oil & Gas Co.*, *supra*. The stipulation is that in November 1939, the price paid by Republic Steel Corporation was increased from 6 cents per unit[2] to 6¼ cents. The parties have also stipulated figures which show that the average sales price of ore per unit and per ton was higher in 1940 than in the two preceding years. From these figures it is possible to work out fairly the amount of 1940 income that was due to the higher price for ore in that year. This matter will be discussed further in the latter part of this opinion.

Another argument advanced by the respondent is that there was no mining income in 1940 which was the result of over a year's unproductive exploration or prospecting. The statute does not require that the exploratory years be wholly unproductive. We think that this is a sufficient answer to this part of the respondent's argument.

The respondent also contends that the increase in income was not due solely to exploration and prospecting, as required by section 721, but resulted from a combination of factors. He cites cases wherein we referred to income being due to factors other than those mentioned in the statute, such as management and salesmanship, good will, the use of physical assets, and the use of new machinery and equipment. *Ramsey Accessories Manufacturing Corporation*, 10 T. C. 482, *Keystone Brass Works*, 12 T. C. 618. Such factors were not responsible for the increased income of Wade and Richey, Incorporated, in the year 1940. There was no element of good will in its sales as all of its ore was sold to one customer who was willing to take all that it could produce. It did acquire some additional machinery, but that was solely for the purpose of realizing income as quickly as possible from the discovery of the large iron ore deposit. The use of additional equipment was incidental to the increased income and not the direct cause of it as, for instance, in the case of the expansion of manufacturing facilities.

As we have indicated, we think that the petitioners have demonstrated that the corporation met the basic requirements for relief as

---

[1] A Glossary of the Mining and Mineral Industry, by Albert H. Fay.

[2] A "unit" represents the percentage of iron in the rough ore.

to its 1940 income in that the income from brown ore operations was in excess of 125 per cent of the average amount of income of that class for the years 1938 and 1939, and that such excess income resulted from exploration and prospecting of leased tangible property extending over a period of more than 12 months.

Section 721 (a) (3) defines the term "net abnormal income" as follows:

The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

Section 721 (b) provides that the amount of net abnormal income that is to be attributed to other years shall be determined under the respondent's regulations. Regulations 109, section 30.721–1, *et seq.*, as amended by T. D. 5045, 1941–1 C. B. 69, use as the basis for the computation of the amount attributable to prior years the gross income of the particular class. Such gross income is reduced by the statutory 125 per cent of the average for prior years, and then by an allocated portion of direct costs deductible in determining the normal tax net income for the taxable year. The petitioners have submitted a computation of the amount of net abnormal income that is attributable to prior years which is based on stipulated figures and appears to us to follow the provisions of the statute and the regulations. That computation is as follows:

| | |
|---|---:|
| Brown ore gross income for 1938 and 1939 | $321,356.30 |
| Average | 160,678.15 |
| 125 per cent of average | 200,847.69 |
| (1) 1940 gross income from brown ore | 410,250.64 |
| (2) Less 125 per cent of average of 1938 and 1939 excess of (1) over (2) | 200,847.69 |
| | 209,402.95 |
| Direct costs for 1940 | 334,184.56 |
| Ratable portion of direct costs | 170,577.82 |
| Excess of 1940 abnormal income over average of 1938 and 1939 income | 209,402.95 |
| Less allocable portion of 1940 direct costs | 170,577.82 |
| Net abnormal income attributable to prior years | $38,825.13 |

The respondent has not submitted any proposed computation of the amount of the net abnormal income that is to be attributed to prior years, presumably because of his position that the petitioners have failed to establish that the operations of Wade and Richey, Incorporated, qualified that corporation for relief under Code section 721.

The petitioners' computation follows the pattern of examples given in the regulations. The starting point of the computation is the gross income for 1940 in the amount of $410,250.64. That amount, we think, should be reduced so as to eliminate the result of the increased price for ore that went into effect on November 1, 1939. Applying to the 1940 tonnage sold the average price that was in effect prior to November 1, 1939, and reducing the resultant figure by 125 per cent of the average of 1938 and 1939 income and by an allocated portion of 1940 direct costs leaves $17,220. That amount we hold is the net abnormal income for 1940 that is attributable to the years 1938 and 1939.

Reviewed by the Special Division.

*Decisions will be entered under Rule 50.*