Dr. P. Phillips and Sons, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 24505. Promulgated May 25, 1953.

*George E. H. Goodner, Esq.*, and *Dewey R. Roark, Jr., Esq.*, for the petitioner.*

*Newman A. Townsend, Esq.*, for the respondent.

---

*Trial counsel for petitioner withdrew after the hearing of this proceeding, and briefs were subsequently submitted on behalf of petitioner by *Carolyn E. Agger, Esq.*, and *Walter J. Rockler, Esq.*

OPINION.

Rice, *Judge:* Petitioner contends that it qualifies for relief from excess profits tax for the taxable year 1943 under the provisions of section 721 of the Internal Revenue Code. That section deals with abnormalities in income in an excess profits tax period. It defines the terms used, the separate classes of income, and provides for computing "the amount of net abnormal income" that shall be attributed to other years, thereby reducing the excess profits tax for the taxable year. We have held that it was enacted by Congress to prevent the unfair application of the excess profits tax in abnormal cases,[1] and that it imposes both affirmative and negative burdens of proof upon a taxpayer attempting to qualify thereunder.[2] The pertinent provisions of the section are set forth in the margin.[3]

---

[1] *Soabar Co.,* 7 T. C. 89, 96 (1946).—

[2] *Eitel-McCullough, Inc.,* 9 T. C. 1132, 1146 (1947).

[3] Sec. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, * * *

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income :

* * * * * * *

(C) Income resulting from exploration, discovery, prospecting, research, or devel-

Petitioner claims that in 1943 its gross income included a class of income that was abnormal in amount, was a separate class of income as described in subparagraph 721 (a) (2) (C), and that it had "net abnormal income" in the amount of $463,413.41, a portion of which is attributable to previous years under section 721 (b) and respondent's regulations with respect thereto. If it had no 721 (a) (2) (C) class income, petitioner claims, in the alternative, that such income should be classified under the general provisions of 721 (a) (2).

Respondent contends that the growing of citrus crops is not a "development of tangible property" which entitles petitioner to classify its income from citrus operations as 721 (a) (2) (C) income. He maintains that the separate class of income provided for by this subparagraph was intended for the mining industry, corporations that develop new processes, and similar enterpreneur activities. But, he says, even if the cultivation of citrus trees is within the ambit of the section, petitioner fails to qualify for the reason that all of its claimed abnormal income was due to increased prices, increased demand, government buying for lend-lease and for the armed forces, and other factors.

In claiming that it has a separate class of income under 721 (a) (2) (C), petitioner specifically limits its claim to income resulting from the "development of tangible property." No claim is made that it had income resulting from exploration, discovery, prospecting, research, patents, formulae, or processes. It argues that citrus trees are "tangible property" and that the promotion of their growth by proper cultivation is "development" for the reason that the term "to develop" means literally "to promote the growth of." [4] Income resulting from increased productivity of maturing citrus trees, says petitioner, is "income resulting from the development of tangible property," and the application of materials and labor to the cultiva-

opment of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months;

\* \* \* \* \* \* \*

All the income which is classifiable in more than one of such subparagraphs shall be classified under the one which the taxpayer irrevocably elects. The classification of income of any class not described in subparagraphs (A) to (F), inclusive, shall be subject to regulations prescribed by the Commissioner with the approval of the Secretary.

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. \* \* \*

[4] Webster's New International Dictionary, Second Edition.

tion of young citrus trees, the fertilization and irrigation of the soil, the planting of cover crops, and the spraying, dusting, and pruning of its citrus trees are as much developmental activities as activities designed to facilitate the removal of oil from wells [5] or coal from mines.[6]

Petitioner's alternative contention is based upon the amendments to section 721 of the Code by section 5 of the Excess Profits Tax Amendments of 1941, which provided that "classification of income of any class not described in subparagraphs (A) to (F), inclusive, shall be subject to regulations prescribed by the Commissioner with the approval of the Secretary." [7] It claims that this amendment broadened the scope of section 721 to include any classification of income under appropriate Treasury Regulations, and cites in support thereof a decision of this Court,[8] which held that royalty income was different in character and had no qualities or attributes in common with any other type of income derived from petitioner's operations as a manufacturer of hosiery, and, therefore, was a "class of income" within the meaning of 721 (a) (2). It submits that, if denied 721 (a) (2) (C) classification, it had a class of income under the general unlettered provisions of 721 (a) (2) because it derived abnormal income from its citrus operations in the taxable year which is attributable to prior years. Except for this one reference to its alternative contention, which appears in a footnote, petitioner's original and reply brief seek to establish its right to relief under 721 (a) (2) (C).

We find it unnecessary to decide the questions raised by petitioner's arguments because even if we assume, as we did in *Primas Groves, Inc.*,[9] and *Graves Brothers Co.*,[10] that petitioner's citrus income constituted a separate or any class of income for the base period and the taxable year, which under the statutory formula is abnormal in amount and which, when reduced pro rata by direct costs or expenses, results in net abnormal income, we are, nevertheless, convinced that petitioner has failed to prove that any part of such net abnormal income is attributable to prior years so as to entitle it to relief.

Our findings show that petitioner's net abnormal income, computed under the statutory formula was $463,413.41, and we do not understand that respondent objects to the correctness of this computation. In adjusting this amount to give effect to wartime conditions, petitioner concedes that increased prices in the taxable year gave rise to a substantial part of its net abnormal income for 1943, namely, $228,-

---

[5] *Southwestern Oil & Gas Co.*, 6 T. C. 1124 (1946).

[4] *Morrisdale Coal Mining Co.*, 13 T. C. 448 (1949).

[7] Section 721 (a) (2), footnote 3, *supra*.

[8] *W. B. Davis & Son, Inc.*, 5 T. C. 1195, 1207 (1945).

[9] *Primas Groves, Inc.*, 15 T. C. 396 (1950).

[10] *Graves Brothers Co.*, 17 T. C. 1499 (1952).

773.71; but it contends that such amount reflected all other wartime factors, so that any further adjustments for factors such as low operating costs, increased demand including government purchases, and decreased competition, as specified in respondent's regulations,[11] are inapplicable, unnecessary, and unreasonable in the circumstances of this case.

We cannot agree that petitioner's adjustment for price increases on the sale of its citrus fruit adequately measures the entire improvement in business conditions in the taxable year, nor can we agree that its adjustment for price increases adequately measures the actual increase in prices that petitioner received for its citrus fruit in the taxable year. In determining its price increase adjustment, petitioner made up an index using Florida on-the-tree orange and grapefruit prices for the years 1935–36 through 1939–40 as a base of 100. In arriving at the base price, it assigned the average price of oranges during the period a weight of four, and grapefruit a weight of one. On this index, prices for the taxable year had increased 97.5 per cent over the average prices of the base period. Petitioner then computed the amount of net abnormal income attributable to price increases in the excess profits tax year of 1943 to be $228,773.71.[12]

The petitioner's position is reflected by its contention that "an adjustment for price rises cannot, under the regulation, exceed net abnormal income, since the 'items of net abnormal income' cannot exceed total net abnormal income." Petitioner would read respondent's Regulations, section 35.721–3, *supra*, to mean that in no instance could higher prices in the taxable year create all of the net abnormal income so that no part thereof could be attributed to prior years. But this case illustrates how improvement in business conditions generally, including higher prices, can result in net abnormal income in an excess

---

[11] Regs. 112, Sec. 35.721–3 AMOUNT ATTRIBUTABLE TO OTHER YEARS.

\* \* \* \* \* \* \*

Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events. To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for or decreased competition in the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years if such item is of a class of income which is in excess of 125 percent of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions. In attributing items of net abnormal income to other years, particular attention must be paid to changes in those years in the factors which determined the amount of such income, such as changes in prices, amount of production, and demand for the product. No portion of an item of net abnormal income is to be attributed to any previous year solely by reason of an investment by the taxpayer in assets, tangible or intangible, employed in or contributing to the production of such income.

[12] Petitioner's contention is stated as follows: "Mathematically stated, abnormal income for the year ended in 1943 attributable to the price rise is determined as follows: 197.5/100 equals $463,413.41/x. 'x' is the amount of income which is *not* attributable to the price rise. 'x' is $234,639.70. $463,413.41 less $234,639.70 equals $228,773.71, the amount of income attributable to the price rise."

profits tax year, all of which is attributable to the taxable year and none of which can be attributed to previous taxable years. Our findings show that for the first three of the four previous taxable years petitioner's average annual cost per box of citrus fruit exceeded its average annual selling price per box, and that only in the taxable year 1942 did its average selling price per box exceed its average cost per box. It is not surprising, therefore, to find that the average cost per box for the four previous years exceeded the average selling price per box for such years by 2.3 cents per box. It also appears that petitioner's average selling price per box for the taxable year exceeded its average cost per box by 70.9 cents, and exceeded the average cost per box for the four preceding taxable years by 78.8 cents per box. If these price differentials are applied to the boxes of fruit sold by petitioner in the taxable year, it is at once apparent that no part of the net abnormal income is attributable to any previous taxable year and that all of it is attributable to the excess profits tax year 1943. This is true even though adjustment is made for the increased cost per box of citrus fruit in the taxable year.

Thus, even assuming petitioner had a separate class of income under 721 (a) (2) (C), or a class of income under 721 (a) (2) generally, we are of the opinion that it is not entitled to relief under section 721. In so holding we have weighed the various factors set forth in our findings which affected citrus fruit prices, including the heavy demand for fresh and processed citrus fruit during the taxable year, and the effect that high prices had on the amount of fruit picked by the petitioner. Actually petitioner realized large profits in the taxable year because good weather conditions produced a record crop which petitioner sold at high prices due to a war inflated economy. The excess profits which resulted from such external changes in business conditions were the profits which Congress intended to tax. *Soabar Co.*, *supra*.[13]

Reviewed by the Special Division.

*Decision will be entered for the respondent.*