AMERICAN METAL CLIMAX, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 58218. Filed November 26, 1963.

*John P. Lipscomb, Jr.*, for the petitioner.
*Arthur N. Mindling* and *S. A. Winborne*, for the respondent.

300

302

304

310

312

OPINION

Petitioner seeks relief under the Internal Revenue Code of 1939 for claimed net abnormal income in 1942, of the class and as defined in section 721 (a) (1), (a) (2) (C), and (a) (3).[2]  It relies on exploration

---

[2] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, * * *

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

*       *       *       *       *       *       *

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; * * *

*       *       *       *       *       *       *

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

and development expenditures made over a period in excess of 12 months which in 1942 allegedly produced income in excess of 125 percent of income resulting from such expenditures earned in the 4 previous taxable years. Petitioner concludes that it is entitled to have such income attributed to prior years under section 721(b) [3] and excluded from the coverage of the excess profits tax pursuant to section 721(c).[4]

Respondent denies that there was any abnormal income for the year 1942. He further contends, *inter alia*, that even if there were any such income, none of it can be attributed to any prior year. He relies upon the statutory purpose, and more specifically upon section 35.721-3, Regs. 112.[5] He urges that great weight be given to his regulation because of the legislative history of section 721.

The World War II excess profits tax was first enacted by the Second Revenue Act of 1940.[6] The two prime objectives of this legislation were (1) to raise revenue for the national defense program, and (2) to insure that the rearmament program should not permit either the creation of "war millionaires" or the further substantial enrichment of already wealthy persons (H. Rept. No. 2894, 76th Cong., 3d Sess., pp. 1-2 (1940), 1940-2 C.B. 496).

---

[3] (b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. * * *

[4] (c) COMPUTATION OF TAX FOR CURRENT TAXABLE YEAR.—The tax under this subchapter for the taxable year, in which the whole of such abnormal income would without regard to this section be includible, shall not exceed the sum of:

(1) The tax under this subchapter for such taxable year computed without the inclusion in gross income of the portion of the net abnormal income which is attributable to any other taxable year, and

(2) The aggregate of the increase in the tax under this subchapter for the taxable year (computed under paragraph (1)) and for each previous taxable year which would have resulted if, for each previous taxable year to which any portion of such net abnormal income is attributable, an amount equal to such portion had been included in the gross income for such previous taxable year.

[5] SEC. 35.721-3 *Amount Attributable to Other Years.*—The mere fact that an item includible in gross income is of a class abnormal either in kind or in amount does not result in the exclusion of any part of such item from excess profits net income. It is necessary that the item be found attributable under these regulations in whole or in part to other taxable years. Only that portion of the item which is found to be attributable to other years may be excluded from the gross income of the taxpayer for the year for which the excess profits tax is being computed.

Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events. To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for or decreased competition in the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years if such item is of a class of income which is in excess of 125 percent of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions. In attributing items of net abnormal income to other years, particular attention must be paid to changes in those years in the factors which determined the amount of such income, such as changes in prices, amount of production, and demand for the product. * * *

[6] 54 Stat. 974.

The classes of income defined as abnormal included six [7] separate classes. The common characteristic of each class was that it represented defined income currently received that would have been received in the current year regardless of the presence of World War II. The excess profits tax was designed to tax profits arising from the war effort, and section 721 was inserted as a relief provision to alleviate the impact of the receipt currently of income attributable to events or transactions occurring prior to the imminence of the war.

In 1941 Congress amended the 1940 legislation.[8] Congress realized that it could not foresee all possible hardship cases under the excess profits tax, and sought merely to outline the general nature of types of income for which it wished to afford relief. The Treasury Department and the then Bureau of Internal Revenue were intentionally given wide discretion in promulgating regulations within the spirit of the legislation. The legislative history explains this as follows (H. Rept. No. 146, 77th Cong., 1st Sess., p. 2 (1941), 1941–1 C.B. 550–551):

Experience with excess-profits taxes, both in the United States and abroad, has demonstrated conclusively that relief in abnormal cases cannot be predicated on specific instances foreseeable at any time. The unusual cases that are certain to arise are so diverse in character and unpredictable that relief provisions couched in other than general and flexible terms are certain to prove inadequate.

For these reasons, the present legislation attempts to provide, both by specific terms and in carefully guarded general terms, a set of flexible rules which should alleviate at least the bulk of the severe hardship cases which may arise. The success or failure of legislation of this type depends, to a considerable degree, upon its intelligent and sympathetic administration. Through its confidence in the experience and ability of the officials of the Treasury Department and the Bureau of Internal Revenue, your committee recommend the present flexible and broad legislation as the most satisfactory method of meeting the contingencies that will arise.

Pursuant to this directive, respondent promulgated the regulation quoted above and it has been upheld many times. *Primas Groves, Inc.*, 15 T.C. 396, 401; *Soabar Co.*, 7 T.C. 89, 97; *Steel or Bronze Piston Ring Corporation*, 13 T.C. 636, 642.

This case was reopened because the record supports the proposition that the efforts of this petitioner in exploration and development of its mine had made available an adequate supply of molybdenum at a stable price for the first time and that as a result of this, the general use of molybdenum as an alloying element by industry, as a substitute and even as a replacement for other alloys, had been encouraged and had taken place and was continuing, prior to and throughout 1942.

---

[7] Reduced to five in 1941.
[8] The Excess Profits Tax Amendments of 1941, 55 Stat. 17.

The rate of use of molybdenum had, through the years, increased faster than the rate of increase in use of other alloying elements which were being replaced by molybdenum. If a proper formula, eliminating wartime pressures, could be devised to measure this difference in increased rate of use and the formula applied to the year 1942, then war-induced increase could be strained out of petitioner's income for such year.

The first question is whether petitioner has realized income of a class described in section 721(a)(2)(C). We have found this in the affirmative in our findings and, in language which we here adopt, we noted in the withdrawn opinion that—

Petitioner has made expenditures in the exploration and development of its mine, especially at the Phillipson Level, without which the increased production of 1942 would have been impossible. Since the terms "exploration" and "development" are not defined in the statute, we must look to their meaning in the mining industry. "Exploration" refers to "The work involved looking for ore," and "development" is defined as "work done in a mine to open up ore bodies, as sinking shafts, driving levels, etc." [9] From the facts of this case there can be no doubt that petitioner expended substantial sums on exploration and development work for a period well in excess of 12 months. It therefore has realized income of the class described in section 721(a)(2)(C).

A second question is whether any part of the net abnormal income can be attributed to other years under section 721(b) and section 35.721-3, Regs. 112. In the withdrawn opinion we noted that while some attribution might be proper, the evidence did not provide a reliable basis for attribution:

Although some small segment of the development expenditures might normally have resulted in increased 1942 production, petitioner's indices do not afford any reliable basis for ascertaining this normal growth * * *

The supplemental evidence has afforded a reliable basis for ascertaining the relevant growth, and therefore, we may properly attribute a portion of the relevant net abnormal income to other years.

It has been found that $24,611,848 is the amount of 1942 corrected gross profit on sales. This must be adjusted by the $981,294 loss suffered by Climax on the relevant conversion operation, since income or loss from factors not comprehended in section 721(a)(2)(C) must be strained out. The resulting $25,593,142 is reduced by 125 percent of the 1938-41 average, or $14,701,491, totaling $10,891,651. Sec. 721(a)(3)(A).

The $10,891,651 is next reduced by a ratio in which the relevant direct costs are comprehended. Sec. 721(a)(3)(B). Petitioner does not dispute the use of cost depletion, and, in interpreting "direct costs

---

[9] A Glossary of the Mining and Mineral Industry (U.S. Dept. of Interior, Bull. No. 95), pp. 255, 214.

**316**

or expenses" as used in section 721(a)(3)(B), we have included cost depletion rather than the percentage depletion which respondent asserted. Section 721(a)(3) uses the following terms: *"direct costs or expenses*, deductible in determining the normal-tax net income of the taxable year, through the *expenditure* of which such abnormal income was in whole or in part derived." (Emphasis added.) Climax's deduction in 1942 for percentage depletion did not represent an expenditure or cash outlay through which abnormal income was in whole or in part derived. Cf. *Sprague Electric Co.*, 36 T.C. 1043, 1086.

Percentage depletion does not involve expenditure or cash outlay, nor is it a cost for accounting purposes. *Louisiana Iron & Supply Co.*, 44 B.T.A. 1244, 1246; *Mary F. Waggoner*, 47 B.T.A. 699. Further, our treatment is consistent with *Morrisdale Coal Mining Co.*, 13 T.C. 448, 452, and section 35.721-1, Regs. 112, example 2. Finally, if Congress had meant to refer to all deductions *attributable* to abnormal income, it would not, in our opinion, have used the terminology "direct costs or expenses" and "expenditure."

Using the resulting $2,056,293 as the direct cost figure, the relevant ratio totals an $875,095 reduction from the $10,891,651, and we have found that $10,016,556 was the 1942 net abnormal income.

"[N]ot unmindful of the difficulties involved," *General Tire & Rubber Co.*, 29 T.C. 975, 988, we have utilized the replacement factor of 0.0156 and, with due regard to *Ramsey Accessories Manufacturing Corporation*, 10 T.C. 482, we have found that petitioner's net abnormal income for 1942 due to exploration and development and attributable to prior years is $150,000.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*